RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

THE NATURE CONSERVANCY, INC.,
　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

LARRY and MARSHA K. SIMS,
　　　　　　　　*Defendants-Appellants.*

Nos. 09-5634/6070

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:07-cv-112—Joseph M. Hood, District Judge.

Decided and Filed:  May 21, 2012

Before:  MERRITT and ROGERS, Circuit Judges; POLSTER, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:**  David Russell Marshall, Nicholasville, Kentucky, for Appellants.  G. Thomas Barker, Ernest H. Jones II, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellee.

ROGERS, J., delivered the opinion of the court, in which POLSTER, D. J., joined.  MERRITT, J. (pp. 12–17), delivered a separate dissenting opinion.

_____

### OPINION
_____

ROGERS, Circuit Judge.  Larry and Marsha Sims appeal a district court order holding that the Sims violated a conservation easement that was part of a real estate purchase agreement regarding The Nature Conservancy's ("the Conservancy") sale and the Sims's purchase of a 100.10 acre farm in Kentucky.  The district court granted the

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

Conservancy's summary judgment motion after determining that the Sims violated the easement by filling in a sinkhole and thereby substantially altering the topography of the land. In a subsequent judgment, the district court awarded the Conservancy $99,796.41 in attorneys' fees, costs, and expenses. The Sims now appeal both judgments. The district court properly ruled, however, that the Sims violated the plain language of the easement. The district court also did not abuse its discretion in awarding the Conservancy reasonable attorneys' fees and expenses.

On December 15, 2001, the Conservancy and Larry and Marsha Sims entered into a real estate purchase agreement for a 100.10 acre farm in Garrard County, Kentucky. The Conservancy sold the property—which was appraised at $260,400 without the easement and $60,000 with the easement—to the Sims for $60,084, in addition to a $244,939 charitable pledge from the Sims to the Conservancy. The Conservancy is a non-profit charity that works to protect ecologically significant land and waterways through the use of conservation easements.

The real estate purchase agreement that included the conservation easement is at the heart of this litigation. Section 1 of the easement states that "the purpose of th[e] Easement [is] to assure that the Protected Property will be retained forever substantially undisturbed in its natural condition and to prevent any use . . . that will significantly impair or interfere with the Conservation Values of the Protected Property." With the easement, the Conservancy received an annual right to enter and inspect the property to verify that the farm was being used in conformance with the standard set forth in a Conservation Documentation Report. The Conservation Documentation Report detailed the conditions of the property as it existed on December 28, 2001, when the easement was made and entered into by the parties. The report divided the property into two areas: (1) residential/agricultural property, which could be used for the Sims's personal residence as well as commercial agricultural purposes; and (2) the Henslow Sparrow Reserve Area, which was limited to grazing livestock and producing hay. The report also discussed the rare plant and animal species on the property.

In January 2005, a representative from the Conservancy inspected the property and documented several violations of the easement. These alleged violations included:

- Failure to file a livestock grazing plan (in violation of Section 3.2)
- Placement of trash in a sinkhole (in violation of Section 2.7)
- Excavation of trees around that same sinkhole (in violation of Section 2.10)
- Alteration of topography on the property by excavating and re-grading a sinkhole behind the Sims's residence (in violation of Section 2.5)
- Permitting the presence of excavated mounds of dirt on the property (in violation of Section 2.5)
- Planting a burning bush, an invasive plant species, near the residence (in violation of Section 2.11)
- Unreasonably prohibiting the Conservancy from entering the property and refusing to cooperate with the Conservancy's monitoring (in violation of Section 5.2)

Though the Sims refer to one sinkhole in their brief, and maintain that they never placed trash in this sinkhole, there were actually two sinkholes involved in the alleged violations. The Complaint describes these sinkholes as one simply "located on the Property" while the other was specifically "located in the field behind [the Sims's] personal residence." The first sinkhole contained trash, which the Sims agreed to remove, so that the Conservancy dropped this allegation. The second sinkhole was located behind the residence, was tested for but did not contain trash, and is the subject of this litigation.

After the parties were unable to resolve their differences, the Conservancy filed a complaint and subsequent motion for a Preliminary Injunction to "permit [the Conservancy], and its outside consultants and experts, immediate access to the subject property, and reasonable access thereafter, to inspect and determine the complete nature and extent of [the Sims's] violations of the Conservation Easement." In response, the Sims removed the burning bush, filed the livestock grazing plan, and removed trash from the first sinkhole. The Conservancy also dropped its request to remove the trees around the first sinkhole. Therefore, the only issue that remained for litigation was whether the

Sims had violated the easement by filling a second sinkhole located behind their residence with soil from a pond excavated on the property.

As a result of a court order, the Conservancy was permitted to inspect the farm and the sinkhole behind the residence. The Conservancy conducted extensive geological core drillings, and no trash was discovered in this sinkhole. While the Sims maintained that they never placed trash in the sinkhole located behind the residence, they admitted using clay and silt from the excavated pond to level and partially fill what they described as a depression in the land. The Conservancy's geologist also conducted a study "to determine the volume of fill in the sinkhole and determine the contours of the ground surface prior to the sinkhole being filled."

The district court granted summary judgment to the Conservancy, concluding that the Sims had violated the easement. The district court held that although the easement allowed some changes to the land's topography in conjunction with authorized activities, like plowing for commercial agriculture, the easement "specifically prohibited" the substantial alteration of filling in a sinkhole. As the court noted, the Sims "did not simply plow a field . . .; they filled a sinkhole with an estimated 6,269 cubic yards of fill material so as to make farming easier." The district court subsequently denied the Sims's motion to alter or vacate the judgment.

On subsequent motion by the Conservancy, the district court entered a judgment granting the Conservancy $77,337.50 in attorneys' fees and $18,092.33 in expenses. After examining the number of hours billed for each motion, the district court determined that the request was reasonable except for the number of hours billed for drafting the summary judgment motion and for responding to media inquiries. As a result, the district court decreased the amount awarded to the Conservancy by $11,774.00. However, the district court determined that all other litigation expenses incurred by the Conservancy, including expert fees, were reasonable, and declined "to question the way the Conservancy's attorneys staffed this case." A few months later, the district court increased the attorneys' fees by $4,366.68 to account for expenses incurred after March 25, 2009.

The Sims now appeal the district court's grant of summary judgment and the award of attorneys' fees and expenses.

The district court correctly determined that the Sims violated the plain terms of the easement by filling in the sinkhole behind their residence. Where the language of a contract is not ambiguous, Kentucky law limits a court's analysis to the "four corners of the document." *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). In determining a contract's plain meaning, the court is "obligated to read the parts of the contract as a whole," and when possible should embrace an interpretation that "promote[s] harmony between . . . provisions." *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 948, 964 (E.D. Ky. 1994) (citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)).

By substantially changing the topography of the property the Sims violated the terms of the agreement. Section 1 of the easement states that "the purpose of this Easement [is] to assure that the Protected Property will be retained forever substantially undisturbed in its natural condition and to prevent any use . . . that will significantly impair or interfere with the Conservation Values of the Protected Property." This purpose is reflected in the list of twelve restrictions on the use of the property, including Section 2.5 entitled "Topography":

> There shall be no ditching; draining; diking; filling; excavating; removal of topsoil, sand, gravel, rock, or other materials; or any change in the topography of the land in any manner except in conjunction with activities otherwise specifically authorized herein.

The easement thus intended to ensure that the overall appearance and topography of the protected property remain substantially unchanged. Though the Sims argue that they were allowed to fill the sinkhole because "the Conservation Easement did not forbid them to do so," Section 2.5 obviously prohibited the Sims from placing 6,269 cubic yards of fill material in the sinkhole behind their residence. These actions were a clear violation of the plain meaning of the agreement and of the parties' intentions.

The Sims's first argument that they were allowed to "enhance their agricultural usage" of the land under Section 3.2, does not support a different conclusion. A letter from the Sims's attorney to James Aldrich, Director of the Nature Conservancy in Lexington, explains how the "sinkhole created a problem for [the Sims] and they . . . addressed that problem by filling in the hole to adjust the grading." The Sims draw the court's attention to the last clause of Section 2.5, which states that the Sims must not alter the topography of the land "except in conjunction with activities otherwise specifically authorized herein." Pointing to Section 3.2, which permits "commercial agricultur[e]," the Sims assert that because farming is an "activity otherwise specifically authorized," they were allowed to fill the sinkhole to create more land for farming.

The district court correctly reasoned that while Sections 2.5 and 3.2 together permit minor alterations to the land, such as plowing, to allow for "growing crops, raising and selling native plants and their seeds, grazing livestock, cutting, bailing and removing hay," this does not justify the extensive re-grading of the sinkhole. Re-grading the land by placing 6,269 cubic yards of fill material into a depression, where the conservation easement explicitly forbids "filling," is not a normal precursor to farming activities. As the district court states, "read together, [Sections] 2.5 and 3.2 clearly contemplate alteration of the topography as a consequence of the growing of crops, but not 'draining; diking; filling; [or] excavating' for the sole purpose of making farming easier."

Some loss in the agricultural value of the land was, moreover, likely anticipated by the parties. The Sims received a substantial benefit from the purchase of the land with the easement. Though the conservation easement may have arguably hindered their ability to "enhance their agricultural usage," the Sims only paid $60,084 for the property, in addition to a $244,939 charitable pledge that resulted in a tax benefit. The parties undoubtedly anticipated a substantial reduction in the economic value of the land.

The Sims's second argument is that when Section 2.5 is read in conjunction with Section 3.7, the reasonable extension of the permission to "dig wells" and "create ponds" is the ability to place the excavated dirt in a sinkhole on their land. The Sims argue that

any other reading of the two sections would be unworkable, as after digging the permitted pond the excavated dirt would have to "mysteriously evaporate[ ]" or be "transported off [the] premises."

The Sims's interpretation of the conservation easement is unreasonable, as it would allow a Grantor to breach one provision in order to enhance their enjoyment of another provision. While the exception in Section 2.5 may allow "ditching" to dig a well or create a pond, two authorized activities, this does not necessarily mean that the Grantor is also allowed to use the excavated dirt to fill an entirely separate hole or depression on the property. Section 3.7 is silent as to what should happen with the excavated dirt, and this silence does not create "authorization" for an activity that would otherwise be explicitly prohibited. Though the Sims lament the difficulty of disposing of the excavated dirt, there are doubtless ways to do so, without violating the easement. In any event, the difficulty of disposing of the dirt does not justify ignoring the easement, which protects the "significant natural, aesthetic, scientific and educational value[ ] of the land."

The Sims's remaining contentions also fail. The Sims argue that their actions were justified because the status of the depression as a sinkhole was undisclosed prior to their filling in the area. However, regardless of whether the sinkhole was truly a sinkhole or a "dip" or "depression" as originally thought, Section 2.5 prohibits any substantial change in the topography. The Sims also stipulate that they would not have built a $250,000 residence near the sinkhole if they knew that they could not re-grade the land surrounding the structure. But Section 2.5 explicitly states that filling and changing the topography is not permitted, and it was up to the Sims and their builder to recognize the limitations of their selected location for the home. Thus, the district court properly held that the Sims violated the terms of the agreement.

The district court moreover did not abuse its discretion in awarding the Conservancy $77,337.50 in attorneys' fees and over $22,000 in expenses. The conservation easement authorized the district court to grant reasonable attorneys' fees and expenses. Section 5.1 states:

> All reasonable costs incurred by the Conservancy in enforcing the terms of this Easement against Grantor, including, without limitation, costs and expenses of suit and reasonable attorneys' fees, and any costs of restoration necessitated by Grantor's violation of the terms of this Easement shall be borne by Grantor.

The parties agree that the issue on appeal is whether the fees were reasonable, and that to determine this question the court should apply an abuse of discretion standard. *Perotti v. Seiter*, 935 F.2d 761, 763 (6th Cir. 1991) (stating standard). In general, this court "give[s] great deference to district courts when reviewing an attorney's fee award." *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009). This is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983).

The Sims rely on the twelve factors for determining the reasonableness of statutory attorneys' fees in discrimination cases outlined by this court in *Paschal v. Flagstar Bank*, 297 F.3d 431 (6th Cir. 2002). The factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 435 (citations omitted). Assuming the applicability of these factors to contractual fee-shifting provisions, the district court carefully considered the majority of these issues and thus did not abuse its discretion in deciding upon a reasonable award for the Conservancy. This Circuit does not require that the district court apply the *Paschal* factors, *id.* at 435; rather, the touchstone for reasonableness is simply determining whether a fee "is one that is adequate to attract competent counsel, but not produce windfalls to attorneys." *Id.* at 434 (citations and ellipses omitted). As the fees in this

case ensured competent counsel but do not appear to have overcompensated the Conservancy's attorneys, the district court did not abuse its discretion in determining the award.

With regard to difficulty, implicating both the "time and labor required" as well as the "novelty" of the case, *id.* at 435, the Sims argue that because there was only a "single issue" litigated, the time and effort spent by the Conservancy's attorneys was unreasonable and the attorneys should not have been compensated. Both parties debate who ultimately prevailed on a number of claims in this case. However, regardless of who actually "won" the settled claims that were not litigated, the district court correctly concluded that "the Conservancy obtained the vast majority of the relief it sought," including prevailing on its summary judgment motion. Of the alleged violations, all but one—the trees near a different sinkhole—were resolved in a manner that was favorable to the Conservancy. Though "unsuccessful claims" arguably should not count towards attorney fees, the reality of litigation is that "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley*, 461 U.S. at 435. Because this case "involve[d] a common core of facts" and is "based on related legal theories," *id.*, and the Conservancy achieved its desired result on the majority of the alleged violations, the district court did not abuse its discretion when it considered the overall efforts of the Conservancy's attorneys in this litigation.

As for the amount of time the Conservancy's attorneys spent on the case, the district court carefully examined the hours billed, breaking down all of the hours by motion. After reviewing the billing records, the district court decreased the amount awarded to the Conservancy by $11,774.00. First, the district court found that 66 hours for drafting the summary judgment motion was "unreasonable," and limited that number to 10 hours. The district court then determined that because the "outcome of th[e] litigation did not depend . . . on the responses to media inquiries," these hours should not count towards the total. In addition, the district court specifically discussed the value of various uses of the attorneys' time, including inspections of the property, legal research,

and responding to audit inquiries. With this detailed analysis, the district court did not abuse its discretion in determining how many hours should count towards the assessment of reasonable attorneys' fees.

Describing the work of the Conservancy's lawyers as a "duplication of efforts," the Sims argue that one attorney could have litigated the case for the Conservancy and thus the award was excessive. However, it was reasonable for the district court not "to question the way the Conservancy's attorneys staffed this case," especially since it is "quite customary, and in fact more economical, for an associate level attorney to handle simple matters such as this while being advised by more seasoned attorneys." As one lower level associate billed over four times more than all of the partners on this case combined, there is no reason to question the district court's determination on this issue.

Regarding the importance of the case itself, though the Sims argue that there is nothing about this case that makes it rare or exceptional, they provide little evidence to undermine the assertion that this was a critical case for the Conservancy. It is easy to see how a non-profit organization like the Conservancy, which fulfills its mission through easements like the one in this case, would have considered the legal interpretation of the language in the easement to be an important issue.

Similarly, the Sims provide nothing, and there is nothing in the record, to discredit the Conservancy's assertion that its counsel received no compensation and took this case on a contingency fee basis. The Supreme Court has held that an attorney fee request should "not result in a second major litigation," *Hensley*, 461 U.S. at 437; therefore, it was reasonable for the district court to deny the Sims's request for an evidentiary hearing to determine if a favorable fee arrangement existed between the Conservancy and its counsel, allegedly resulting in a windfall for its attorneys.

The Sims also argue, without any case citations, that the district court should have considered the Sims's ability to pay in light of their position as "farmers who earn their subsistence from agricultural pursuits." Moreover, there is nothing in the record to suggest that the Sims could not afford the fee determined by the district court.

The Sims also contest the $14,500 fee awarded to the Conservancy to pay for a geologist and the $2,927.41 paid by the Conservancy for the Preliminary Injunction bond. Because these were reasonable expenditures "incurred by the Conservancy [to] enforc[e] the terms of th[e] Easement," the district court did not abuse its discretion in including these expenses in the award owed to the Conservancy.

The Sims claim that the "real purpose for which the Conservancy retained a geologist was to conduct core drillings and otherwise excavate the depression/sinkhole . . . to locate garbage and trash which the Conservancy erroneously alleged had been placed in that area by the Sims." But the Conservancy did not contend that trash was put in the sinkhole in question, as explained above. In any event, even if this were part of the reason, the report submitted by the Conservancy's geologist explicitly states that:

> The objective of the evaluation was to determine the volume of fill in the sinkhole and determine the contours of the ground surface prior to the sinkhole being filled. Third Rock has also prepared cost estimates for restoration that include the removal of fill from the sinkhole and a vegetative planting plan.

The terms of the conservation easement allow for "costs of restoration necessitated by Grantor's violation of the terms of the Easement"; therefore, it was reasonable for the Conservancy to hire an expert to determine the extent of the damage caused by the Sims and the cost of restoring the land to its natural state.

Finally, because the Preliminary Injunction bond posted by the Conservancy was a "reasonable cost[ ] incurred by the Conservancy" as part of its litigation efforts to enforce the easement, the district court did not abuse its discretion by requiring the Sims to reimburse the Conservancy $2,927.41 for the bond.

The judgments of the district court are affirmed.

_____

**DISSENT**

_____

MERRITT, Circuit Judge, dissenting.  My colleagues have overlooked and make no reference to or analysis of Section 3 of the easement agreement between the parties. (See Appendix attached.)  This section allows the owner to engage in all normal rights of a landowner except those "expressly prohibited."  The agreement does not expressly prohibit filling the sinkhole at issue.

The sinkhole at issue was next to the defendant's home at his farm.  It was an unsightly hole in the ground, a few feet deep, according to the pictures in the record, with half dead trees and brush growing out of it.  Due to the irregular terrain, it could not be mowed, farmed, landscaped or used for a garden or anything else.  It is an eyesore.

In paragraph 3.0 of the environmental agreement entitled "Grantor's Reserved Rights," the landowner (referred to as the "Grantor") — quote — "reserves for Grantor, Grantor's Heirs, Successors and Assigns, all rights as owners of the Protected Property to use the Protected Property <u>for</u> <u>all</u> <u>purposes</u> <u>that</u> <u>are</u> <u>not</u> <u>expressly</u> <u>prohibited</u> herein." (Emphasis added.)  The easement agreement between the Nature Conservancy and the landowner then says:  "Without limiting the generality of the foregoing, the following rights are expressly reserved" to the landowner.  Those "reserved" rights are then listed in eight paragraphs which include (1)  "commercial agricultural purposes," which are broadly defined; (2) in the large area around the house, the installation of "fences, driveways, paths," new "landscaping," and other new features like "flower or vegetable gardens for personal enjoyment;" and (3) "dig wells or create ponds."  The final paragraph in the list then states that the landowner shall not be obligated "to maintain [the] Protected Property in the condition in which it exists on the date of the Conservation Easement."

The only provision my colleagues can point to restricting the filling of the sinkhole adjacent to the home does not mention anything about sinkholes and contains a broadly expressed exception allowing "filling" or "change in the topography . . . in

conjunction with activities otherwise specifically authorized herein," an obvious reference to the long list of activities on the land in Section 3 reserved to the landowner. The full paragraph that my colleagues rely on states:

> 2.5 <u>Topography</u>.  There shall be no ditching; draining; diking; filling; excavating; removal of topsoil, sand, gravel, rock, or other materials; or any change in the topography of the land in any manner *except in conjunction with activities otherwise specifically authorized herein*.

(Emphasis added.)  Literally speaking, the paragraph on its face when parsed allows "filling . . . in conjunction with activities otherwise specifically authorized herein," *e.g.*, "digging a pond" or "landscaping," or farming, etc.

My main point simply is that there is nothing in the agreement that forbids filling the sinkhole.  What is clear, if anything, is the language of paragraph 3 that states that the landowner retains "all rights" that are not "expressly prohibited herein" and the language of paragraph 3.8 that the landowner does not have to "maintain the property" just as it was at the time of the contract.

Beyond that, the record here does not reflect that the sinkhole-filling is harming or affecting anyone except the owners.  The fill from the pond is used for improving and beautifying the property.  I would, therefore, reverse the district court's decision that orders the landowner to now remove all of the fill in the sinkhole and then to pay to the Nature Conservancy a $100,000 judgment.  The environmental agreement itself preserves the landowner's liberty to use his property "for all purposes that are not expressly prohibited," including filling this sinkhole, which is not expressly prohibited. I would preserve this valuable choice or liberty handed down from the common law rather than preserving the sinkhole.  No one in this case has attempted to show or describe what possible value the sinkhole has for purposes of historic and environmental preservation.

Attached to this opinion as an Appendix is the portion of the contract between the parties that contains the operative provisions to be interpreted in this case.

Case: 5:07-cv-00112-JMH-JBT   Doc #: 2-7   Filed: 04/20/07   Page: 9 of 21 - Page ID#: 105

Appendix

1.    PURPOSE. It is the purpose of this Easement to assure that the Protected Property will be retained forever substantially undisturbed in its natural condition and to prevent any use of the Protected Property that will significantly impair or interfere with the Conservation Values of the Protected Property. Grantor intends that this Easement will confine the use of the Protected Property to activities that are consistent with the purpose of this Easement.

2.    PROHIBITED USES/RESTRICTIONS. Any activity on or use of the Protected Property inconsistent with the purpose of this Easement is prohibited. Without limiting the generality of the foregoing, the following activities and uses are expressly prohibited except as provided in paragraph 3 below:

2.1.    Commercial Activity. There shall be no industrial, commercial, or commercial recreational activity undertaken or allowed on the Protected Property. No right of passage shall be granted or retained across or upon the Protected Property if that

- 9 -

Case: 5:07-cv-00112-JMH-JBT   Doc #: 2-7   Filed: 04/20/07   Page: 10 of 21 - Page ID#: 106

right of passage is used in conjunction with such prohibited activities. (See paragraph 3.2 below.)

2.2.    Structures. There shall be no construction or placing of any house, garage, barn or other building, tennis or other recreational court, landing strip, mobile home, swimming pool, fence or sign (other than those permitted, required or allowed by the Conservancy for appropriate management, prevention of hunting or trespass, etc.), asphalt, concrete pavement, billboard or other advertising display, antenna, utility pole, microwave tower, radio/television tower, other transmission towers, conduit, line, sodium vapor light or any other temporary or permanent structure or facility on the Protected Property. (See paragraph 3.3 below.)

2.3.    Subdivision. The Protected Property may not be divided, partitioned, subdivided or conveyed except as required for separate ownership of no more than two (2) residential or agricultural parcels. The minimum size of any subdivided parcel shall be fifty (50) acres.

2.4.    Mining. There shall be no mining, drilling, exploring for or removal of minerals from the Protected Property.

2.5.    Topography. There shall be no ditching; draining; diking; filling; excavating; removal of topsoil, sand, gravel, rock, or other materials; or any change in the topography of the land in any manner except in conjunction with activities otherwise specifically authorized herein.

2.6.    Water. There shall be no manipulation or alteration of creeks, streams, surface or subsurface springs or other bodies of water or the shorelines thereof or any activities on or uses of the Protected Property detrimental to water purity or quality.

2.7.    Dumping/Hazardous Wastes. There shall be no dumping of trash, noncompostable garbage, hazardous or toxic substance or other unsightly or offensive material.

2.8.    Roads. There shall be no building of new roads or other rights of way except for paths and foot trails consistent with the preservation of the Protected Property. Existing roads may be maintained but shall not be widened or improved.

2.9.    Feedlots. There shall be no feedlots permitted on the Protected Property.

2.10.   Removal of Vegetation. There shall be no removal, destruction, cutting, trimming or mowing of any trees or other vegetation, living or dead except (a) to remove hazardous trees for reasons of safety, (b) to construct and/or protect existing or authorized roads, fences, foot trails and paths or areas immediately adjacent to authorized structures,

- 10 -

Case: 5:07-cv-00112-JMH-JBT   Doc #: 2-7   Filed: 04/20/07   Page: 11 of 21 - Page ID#: 107

(c) to use downed and dead timber for personal use as firewood, or (d) to remove invasive, non-native vegetation.

2.11.   Non-Native Species. No invasive non-native plant or animal species shall be introduced to the Protected Property by Grantor without the prior written consent of the Conservancy. The Conservancy may withhold such consent if it determines, in its sole discretion, that a non-native species which Grantor wishes to introduce is invasive and/or would have adverse effects on other tracts of land in the Kentucky River Palisades. Among the animal species that shall not be introduced are: pheasants, wild boar and deer species from Europe or Asia. Among the plant species that shall not be introduced are: bush honeysuckles (Lonicera spp.), privets (Ligustrum spp.), winter creeper (Euonymus fortunei), burning bush (Euonymus alatus), Tree-of-Heaven (Ailanthus altissima), white mulberry (Morus alba), multiflora rose (Rosa multiflora), autumn olives (Elaeagnus spp.), kudzu (Pueraria lobata), Japanese spiraea (Spiraea japonica), English ivy (Hedera helix), periwinkle (Vinca minor), and Asian running bamboos (Phyllostachys spp., Sasa spp.).

2.12.   Spraying. There shall be no use of pesticides or biocides, including but not limited to insecticides, fungicides, rodenticides and herbicides except as may be necessary to eliminate non-native species and with the prior written approval of the Conservancy and except, in the Residential/Agricultural Area, for the use of agricultural chemicals that may be used according to accepted agricultural practices in compliance with all applicable laws and regulations.

3.      GRANTOR'S RESERVED RIGHTS. The Grantor reserves for Grantor, Grantor's heirs, successors and assigns, all rights as owners of the Protected Property to use the Protected Property for all purposes that are not expressly prohibited herein and are not inconsistent with this Easement. Without limiting the generality of the foregoing, the following rights are expressly reserved:

3.1.    Conveyance. Grantor may sell, give, mortgage, lease or otherwise convey the Protected Property, provided that such conveyance is subject to this Easement and written notice is provided to the Conservancy in accordance with paragraph 6.5 below.

3.2.    Agricultural Uses. Notwithstanding the foregoing provisions of paragraph 2, the Residential/Agricultural Area of the Protected Property (as shown on Exhibit B) may be used for commercial agricultural purposes including growing crops, raising and selling native plants and their seeds, grazing livestock, cutting, baling and removing hay, and passage may be allowed across or upon the Protected Property in conjunction with this permitted activity.

Case: 5:07-cv-00112-JMH-JBT   Doc #: 2-7   Filed: 04/20/07   Page: 12 of 21 - Page ID#: 108

The Henslow Sparrow Area of the Protected Property (as shown on Exhibit B) may be used for grazing livestock and for cutting and baling and removing hay upon the following conditions:

    a.    If Grantor elects to use such property for grazing, Grantor shall establish and maintain a prescribed grazing plan acceptable to the Garrard County District Conservationist or such other prescribed grazing plan that is approved in writing by the Conservancy for the Henslow Sparrow Area and shall follow such plan in grazing livestock in the Henslow Sparrow Area.

    b.    No hay shall be cut in the Henslow Sparrow Area from April 15th through July 15th of each year.

    3.3.    Personal Residence. In the Residential/Agricultural Area shown on Exhibit B, Grantor may construct two personal residences, and normal associated outbuildings (such as garages or tool sheds) and may install fences, driveways, paths, septic systems, utilities, underground pipes and wires or overhead wires necessary for the use and enjoyment of the residences. Grantor may maintain, repair and restore the permitted buildings. No buildings, other structures or related improvements may be located in the Henslow Sparrow Area shown on Exhibit B. To the extent consistent with the purposes of this Easement, Grantor may perform routine maintenance, landscaping, and upkeep of the area immediately around any permitted building and may have flower or vegetable gardens for personal enjoyment or consumption in such area.

    3.4.    Signs. Grantor may place interpretive signs and "no hunting," "no trespassing" or similar signs on the Protected Property.

    3.5.    Native Species. Grantor may undertake to restore and enhance the native plant and animal communities on the Protected Property under an ecological management plan which has received the prior written approval of the Conservancy.

    3.6.    Fences. Grantor may, but shall not be obligated to, repair, replace, maintain, improve or remove any fence located on the Protected Property as of the date of this Easement. The Grantor may, but is not obligated to, construct, repair, replace, maintain, improve or remove additional fencing as the Grantor deems necessary to secure the Protected Property.

    3.7.    Wells and Ponds. Grantor may dig wells and create ponds on the Protected Property.

    3.8.    Preservation. Grantor may, but shall not be obligated to, undertake any activity reasonably necessary to maintain the Protected Property in the condition in which it exists on the date of this Conservation Easement.