CUMBERLAND VALLEY CONTRAC-
TORS, INC. and DEL RIO, INC.,
Appellants/Cross–Appellees,

v.

BELL COUNTY COAL CORPORA-
TION and Darrell Huff, Appel-
lees/Cross–Appellants.

Nos. 2000–SC–000951–DG,
2004–SC–001121–DG.

Supreme Court of Kentucky.

Jan. 25, 2007.

Rehearing Denied Dec. 20, 2007.

Jacob P. Cline, III, Middlesboro, Elizabeth Ullmer Mendel, Woodward, Hobson & Fulton, L.L.P., Louisville, Counsel for Appellants/Cross–Appellees Cumberland Valley Contractors, Inc. and Del Rio, Inc.

Perry M. Bentley, J. Peter Cassidy, Jr., Todd S. Page, Palmer G. Vance, II, Stoll, Keenon & Ogden, PLLC, Lexington, Counsel for Appellees/Cross–Appellants Bell County Coal Corporation and Darrell Huff.

MINTON, Justice.

## I. INTRODUCTION.

As a general rule, a party cannot contract away liability for damages caused by that party's failure to comply with a duty imposed by a safety statute. This case presents the question of whether this general rule applies to void a liability-shifting clause in a contract between parties to a coal mining agreement where one side claims economic damages resulting from the other's failure to comply with statutory mine-mapping duties presumably imposed to further mine safety. We find that the clause was clearly written as part of an arm's-length transaction between two sophisticated parties who actually shared the statutory mapping duties. Since there was no apparent gross imbalance of bargaining power, we see no reason to invalidate the exculpatory clause, which clearly bars the claims of Cumberland Valley Contractors, Inc., and its assignee, Del Rio, Inc.

This case also presents a procedural issue in which we hold that the Court of Appeals properly declined to dismiss Bell County Coal Corporation's initial appeal.

## II. FACTUAL BACKGROUND.

In 1989, Bell County Coal Corporation held the mineral rights to the No. 5 underground mine in Bell County, Kentucky, under a mining lease with the landowner, J.M. Huber Corporation. Bell County Coal contracted, in writing, with Cumberland Valley Contractors, Inc., to operate the mine. According to the contract, Bell County Coal and its Chief Engineer were responsible for mine engineering and mine planning. These duties included preparing all mining maps, including mine projection maps, which established the course and direction of mining in No. 5 Mine. Paragraph 30 of the contract contained an exculpatory clause related to the performance of these duties. Darrell Huff became Bell County Coal's Chief Engineer in January 1991.

A series of flooding incidents inside the mine resulted in equipment loss to Cumberland Valley and its assignee, Del Rio, Inc. They also claimed that the flooding prevented them from reaching coal they had planned to mine. The flooding incidents occurred when Cumberland Valley and Del Rio encountered unmapped core holes, sediment ponds, and portions of old mine works. Cumberland Valley and Del Rio assert that these areas were unmapped or inaccurately mapped on the maps provided to them by Bell County Coal despite Bell County Coal's having accurate maps on hand showing the location of core holes, sediment ponds, and old mine works.

Cumberland Valley and Del Rio sued Bell County Coal, Huff, and Huber in the circuit court alleging misrepresentation, negligence, gross negligence, and breach of contract. Bell County Coal moved for summary judgment claiming that among other matters, the suit was barred by Paragraph 30 of the Contract Mining Agreement. The trial court denied the motion, and the case proceeded to a jury trial. The jury found for Cumberland Valley and Del Rio awarding them $795,000.00 for lost equipment and $5,057,106.00 for lost profits. The trial court entered judgment against Bell County Coal in accordance with the jury's verdict.

A panel of the Court of Appeals affirmed the trial court's refusal to enforce the exculpatory clause holding that the exculpatory clause was void as against public policy. The panel then upheld the $795,000.00 award for lost equipment but vacated the award of lost profits stating that these were not proven with sufficient certainty. We granted discretionary review and now reverse the Court of Appeals because we have reached the opposite conclusion concerning the validity of the exculpatory clause. Further facts are set forth as needed in our discussion of specific issues.

## III. ANALYSIS.

### A. The Standard of Review.

 This is a contract case. And the interpretation and legal effect of a contract is a matter of law.[1] So we review the trial court's and the Court of Appeals's determination of whether a contractual provision is void against public policy or other-

wise invalid under a de novo standard, especially since findings of fact are not at issue.[2] The trial court's and Court of Appeals's construction of statutes is also entitled to no deference on appeal because statutory construction is a matter of law subject to a de novo standard of review.[3]

### B. Bell County Coal Made a Timely Appeal to the Court of Appeals.

Cumberland Valley and Del Rio contend that Bell County Coal did not file their appeal to the Court of Appeals in a timely manner; and, therefore, the appeal should have been dismissed. They insist that the trial court's judgment should be fully reinstated.

The trial court entered its judgment following the jury verdict on February 24, 1998, stating "[t]his is a final and appealable judgment, and there is no just reason for delay." On March 5, 1998, Bell County Coal and Huff timely filed a Kentucky Rules of Civil Procedure (CR) 59.05 motion to alter, amend, or vacate the judgment. After hearing oral argument, the trial court entered an Amended Judgment on April 13, 1998, which denied the CR 59.05 motion and also stated, "[t]he original Judgment is adopted but made interlocutory in all respects except as herein amended."

On April 21, 1998, Bell County Coal and Huff filed a CR 59.05 motion to alter, amend, or vacate the amended judgment of April 13, 1998, stating that the amended judgment failed to "adjudicate a sum certain in damages for each of the plaintiffs" and failed to adjudicate Bell County Coal's

---

1. *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky.1992).

2. *See, generally, Anderson v. Ky. Growers Ins. Co., Inc.*, 105 S.W.3d 462 (Ky.App.2003) (rejecting argument that contractual provision was void against public policy to affirm, in part, the trial court's grant of summary judg-

ment on that issue, applying de novo standard of review.).

3. *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth of Ky., Transportation Cabinet*, 983 S.W.2d 488, 490 (Ky.1998).

counterclaim against Del Rio, as well as arguing the appropriate amount of the supersedeas bond. On June 18, 1998, the trial court entered an order ruling on all pending motions, which "overruled all [m]otions." On June 22, 1998, Bell County Coal and Huff filed their notice of appeal. Cumberland Valley and Del Rio filed a motion to dismiss the appeal as untimely, which the Court of Appeals denied in its modified opinion of September 22, 2000.

▪ Cumberland Valley and Del Rio now argue that the trial court's initial judgment, rendered February 24, 1998, recited that it was a final judgment and that there was "no just cause for delay." They argue that Bell County Coal's failure to file a notice of appeal within thirty (30) days of that "final judgment" barred their appeal under CR 73.02(1).

▪ We disagree because the trial court expressly revoked the "finality" of the February 24 judgment when it entered its amended judgment of April 13, 1998, following Bell County Coal's filing of a CR 59.05 motion to alter, amend, or vacate. "In Kentucky, a court speaks through the language of its orders and judgments."[4] Furthermore, as our predecessor-court stated,

> we know of no rule of law that denies to a court the right to revoke an order and substitute in lieu thereof a new and different one, provided that court has not lost jurisdiction over the case involved.[5]

Since Bell County Coal's initial motion to alter, amend, or vacate was filed within ten days of judgment, it was timely filed under CR 59.05. So the trial court retained its jurisdiction and, therefore, was free to revoke its original order, including its statement of finality.

▪ Bell County Coal's separate CR 59 motion to alter, amend, or vacate the amended judgment, entered April 13, 1998, was not an impermissible successive CR 59 motion. While "Kentucky law does not recognize an appeal from an order refusing to reconsider an order denying a new tri-al[,]"[6] the trial court's order of April 13 did not deny the CR 59 motion entirely but amended the substance of its earlier judgment by resolving issues concerning punitive damages, the claim against Huber, the counterclaim against Del Rio, and explicitly revoked the finality of the initial judgment.

▪ As stated by the federal courts, when a trial court makes substantive changes—as opposed to merely correcting clerical errors—in entering an amended judgment, the time for filing an appeal starts from the entering of the amended judgment rather than the original judgment.[7] Since the trial court changed the substance of its judgment by entering the Amended Judgment on April 13, Bell County Coal's timely CR 59 motion regarding the amended judgment was, thus, a CR 59 motion regarding a new judgment, not an impermissible successive CR 59 motion regarding the same judgment challenged by the first CR 59 motion. So

---

**4.** *Glogower v. Crawford,* 2 S.W.3d 784, 785 (Ky.1999).

**5.** *Union Light, Heat & Power Co. v. Public Service Comm'n,* 271 S.W.2d 361, 365 (Ky. 1954).

**6.** *Patrick v. Hiner,* 867 S.W.2d 211, 212 (Ky. App.1993), *citing Cloverleaf Dairy v. Michels,* 636 S.W.2d 894 (Ky.App.1982).

**7.** *See, e.g., Walker v. Bain,* 257 F.3d 660, 671 (6th Cir.2001); *Federal Trade Commission v. Minneapolis–Honeywell Regulator Co.,* 344 U.S. 206, 211, 73 S.Ct. 245, 97 L.Ed. 245 (1952).

the running of the time for appeal stopped until the second CR 59 motion was resolved by the trial court's order of June 18. Bell County Coal's appeal, filed on June 22, 1998, was timely as the Court of Appeals correctly determined.

### C. The Exculpatory Clause Is Valid and Bars Cumberland Valley's and Del Rio's Claims.

■■■■ As Bell County Coal contends on its cross-appeal, we find as a matter of law that all of Cumberland Valley's and Del Rio's claims are barred by Paragraph 30 of the Contract Mining agreement,[8] which provides:

30. *Condition of Premises.* Contractor accepts the Premises hereinabove described in their existing condition and acknowledges that Contractor has made an investigation to determine existing conditions, limitation of the areas involved, equipment necessary to conduct and complete operations, laws affecting performance hereunder, Owner's knowledge of prior mining, location of old works and latent dangers and dangerous conditions. *OWNER MAKES NO IMPLIED OR EXPRESS WARRANTY OR REPRESENTATION CONCERNING THE EXISTENCE, QUANTITY, QUALITY, MINEABILITY OF MERCHANTIBILITY OF THE COAL SEAM WITHIN THE PREMISES, TITLE THERETO OR OTHERWISE AND CONTRACTOR COVENANTS AND AGREES THAT NO REPRESENTATIONS BY OR ON BEHALF OF OWNER REGARDING THE PREMISES, THEIR CONDITION, THE USE OR OCCUPATION THAT MAY BE MADE THEREOF OR THE INCOME THEREFROM.* Owner shall in no event assume or be liable for any loss incurred by Contractor under this Agreement. Owner does not assume any responsibility or liability for the present or future condition of the Premises[,] and Owner shall not be liable to Contractor for any damage to or destruction of the Premises or Contractor's property or the property of other person due to fires, floods, or any other accident or natural catastrophe which occurs on or within the Premises.

We recently stated in *Hargis v. Baize*[9] that:

An exculpatory contract for exemption from future liability for negligence, whether ordinary or gross, is not invalid per se.... However, such contracts are disfavored and are strictly construed against the parties relying upon them.... The wording of the release must be so "clear and understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable."[10]

■■■ Even strictly construing Paragraph 30 against Bell County Coal, we find that the wording of the release was "unmistakable." Paragraph 30 clearly states that Cumberland Valley has investigated prior mine works and latent or dangerous conditions, that Bell County Coal makes no representations regarding the mineability of the coal, and that Bell County Coal will not be liable for damages caused by any

---

**8.** We note that Appellee Darrell Huff was not a party to the Contract Mining Agreement. And we found nothing in the voluminous record where Cumberland Valley and Del Rio attempted to recover from Huff in his individual capacity. Rather, it appears that Cumberland Valley and Del Rio intended to hold Bell County Coal liable for Huff's actions as its employee.

**9.** 168 S.W.3d 36 (Ky.2005) (*quoting* 57A Am. Jur.2d, *Negligence* § 52 (2004)).

**10.** *Id.* at 47 (citations omitted).

flooding.. So we find that "the hazard experienced was clearly within the contemplation of the provision"[11] and that Paragraph 30 cannot be invalidated on the basis of unclear wording or lack of specificity.

Having determined that the wording of the provision was sufficiently clear that Cumberland Valley knew what it was contracting away, we must next determine whether this provision must be invalidated as void against public policy.

Recognizing the importance of freedom to contract, the courts of this Commonwealth have traditionally enforced exculpatory provisions unless such enforcement violates public policy.[12] And despite perceived inconsistencies in recent Kentucky case law, the basic principles regarding the enforceability of exculpatory clauses or contracts were set forth over a century ago in *Greenwich Insurance Co. v. Louisville & Nashville Railroad Co.*[13] In deciding to uphold the exculpatory clause at issue there, our predecessors noted that the parties were "dealing at arm's length and upon an equal footing[,]" and that the contract was entered into voluntarily without either party being compelled to enter into the contract on the basis of necessity.[14] Therefore, the railroad could validly contract away liability for its own negligence "however gross, short of wantonness or willfulness"[15] toward the brewing company, which leased land located in the railroad's right-of-way and built a cold storage house on the right-of-way. The court noted that the railroad, as a common carrier, could not have enforced an exculpatory clause or release of negligence against passengers or freight shipping customers as a matter of public policy because these customers were compelled to travel or ship on the railroad due to its monopoly and, therefore, did not have equal bargaining power.[16] Finding no such disparity in bargaining power between the railroad and the brewing company, the court found no reason to disturb the contract, which the parties entered into on an entirely voluntary basis because the brewing company received consideration for its agreement to bear the risk of fire and because the public was not affected by the parties' contract.[17]

 We conclude that under the long-standing principles of contract law explained in *Greenwich,* the exculpatory clause at hand must be enforced as part of an arm's-length transaction between sophisticated parties with equal bargaining power. We believe that more recent cases, even those invalidating exculpatory clauses on the basis of public policy, can be harmonized with *Greenwich* by focusing on the parties' bargaining power. These cases further suggest that there is no reason to invalidate the exculpatory clause before us.[18]

11. *Id.*

12. See, e.g., *Cobb v. Gulf Refining Co.,* 284 Ky. 523, 145 S.W.2d 96, 99 (1940), *citing* Rest. Contracts § 575 (stating that freedom of contract generally prevails to uphold exculpatory clauses subject to certain exceptions, such as willful breach of statutory duty, personal injury releases in employment contracts, and "contracts where one of the parties (such as a railroad) is charged with a duty of public service, and the bargain relates to negligence in the performance of its duty to the public.").

13. 112 Ky. 598, 66 S.W. 411 (1902).

14. *Id.* at 412–13.

15. *Id.* at 412.

16. *Id.*

17. *Id.* at 413.

18. Fortunately, no third parties were injured or suffered an economic loss as a result of Bell County Coal's improper mine mapping. Thus, this opinion should not be construed to affect the ability of a third-party to bring an action against anyone who enters into a contract which contains an exculpatory clause.

We find this exculpatory clause to be valid, even in light of recent authority disallowing a party to contract away liability for violation of safety statutes. As discussed below, we conclude that the parties shared the duty of preparing accurate mine projection maps to comply with statutes aimed at furthering mine safety. Furthermore, no significant disparity in bargaining power existed between the contracting parties in the instant case, unlike most cases in which exculpatory clauses were deemed invalid due to safety statute violations or other public policy concerns. Thus, we find no reason to disturb the parties' agreement to shift the risk of loss for any violation of a statutory duty, which they both share.

■ We recently stated in *Hargis*,[19] "[a] party cannot contract away liability for damages caused by that party's failure to comply with a duty imposed by a safety statute." Specifically, Cumberland Valley and Del Rio contend that Bell County Coal should not be allowed to contract away its future liability for violation of statutory duties in regard to mine mapping. Under the contract, Bell County Coal had the duty to prepare mine projection maps due to its control of several adjoining mining areas; and the Contractor (Cumberland Valley and its assignee, Del Rio) had the duty to follow these projections strictly when mining.[20]

Cumberland Valley and Del Rio contend that since Bell County Coal undertook the contractual duty to prepare projection maps, Bell County Coal had a concomitant duty to comply with KRS 352.450 when preparing the projection maps. KRS 352.450 states, in relevant part, that the "operator or superintendent" shall make annual maps of "workings" of the mines; and the maps shall show a number of items, including worked-out or abandoned areas and "[a]ll known drill holes that penetrate the coal bed being mined." But Cumberland Valley and Del Rio contend they are not bound by this statute since Bell County Coal acted as an operator or superintendent of the mine. We disagree.

An operator is a "licensee, owner, lessee, or other person who operates or controls a coal mine."[21] A superintendent is "the person who, on behalf of the licensee, has immediate supervision of one [ ] or more mines[.]"[22] Based on the words of the statute, Cumberland Valley and Del Rio were clearly operators or superintendents under these definitions because they operated the mine and had immediate supervision over it. So Cumberland Valley and Del Rio had a statutory duty to ensure that accurate projections were made. But since Bell County Coal had overall control over the No. 5 Mine, as well as other mines in the area, it was also an operator of the No. 5 Mine. So, under the statute, we find that Bell County Coal and Cum-

**19.** 168 S.W.3d at 47.

**20.** The parties' duties regarding mine maps appear in Paragraphs 11 and 12 of their agreement. Paragraph 11 states that Bell County Coal "will provide engineering services at its sole expense." Paragraph 12(a) provides that due to the close proximity of existing or future mining operations by other contractors in other areas to which Bell County Coal retained mineral rights, "in order to allow [Bell County Coal] overall coordination of operations on its lands, [Bell County Coal] will prepare mining plans and projections and review the same with Contractor prior to Contractor's commencing operations." Furthermore, Paragraph 12(a) provides that the Contractor shall "diligently follow" these mining plans and projections, as well as any modifications for which they received notice from Bell County Coal.

**21.** KRS 352.010(z).

**22.** KRS 352.010(ag).

berland Valley and Del Rio shared the duty and responsibility of ensuring that accurate mining projection maps were prepared on an annual basis. Although Cumberland Valley and Del Rio delegated the actual preparation of maps to Bell County Coal by contract, Cumberland Valley and Del Rio still shared the responsibility for ensuring that accurate mining projection plans were prepared. This responsibility is reflected by the recital in the agreement that Cumberland Valley had investigated Bell County Coal's knowledge of prior works, latent defects, and other dangerous conditions.

Assuming that KRS 352.450 qualifies as a "safety statute" since neither party has argued otherwise,[23] we find that both parties to the contract shared the duty of providing accurate mining projections under KRS 352.450, presumably for the purpose of protecting miners and the public at large. We cannot see how the public is harmed by these two sophisticated parties to the contract (who share the duty of preparing accurate mine projections) allocating the risk of their own losses for any inaccuracies between themselves.

A personal injury claim was at stake in *Hargis*, in contrast to the economic claim regarding loss of equipment and lost profits, as in the instant case. We did not expressly limit application of the rule prohibiting contracting against liability for damages for safety statute violation to personal injury cases in *Hargis*. We do not elect to limit or distinguish *Hargis* based upon whether a personal injury or solely

---

23. The legislature did not make explicit findings in regard to Chapter 352. Arguably, the legislative findings provided in KRS 351.101 would apply to Chapter 352, as well as Chapter 351, because the two chapters cross-reference each other in their definitional sections (KRS 351.010 and KRS 352.010); although, KRS 352.450 predates KRS 351.101.

The version of KRS 351.101 in effect during the events leading up to this action and the pendency of this action in the trial court states:

The General Assembly hereby finds and declares the following:
(1) The highest priority and concern of the Commonwealth must be the health and safety of the coal industry's most valuable resource, the miner.
(2) The continued prosperity of the coal industry is of primary importance to the state.
(3) A high priority must be given to increasing the productivity and competitiveness of the mines in this state.
(4) An inordinate number of miners are killed or injured during the first few months of their experience in a mine and upon acquiring new work assignments in a mine.
(5) These injuries result in the loss of life and serious injury to miners and are an impediment to the future growth of the state's coal industry.

(6) Mining is a technical occupation with various specialties requiring individualized training and education.
(7) Injuries can be reduced through proper miner training, education and certification.

In 2001, subsection (8) was added to KRS 351.101, which provides:

Mine safety can be improved by the imposition and enforcement of sanctions against licensed premises and certified and noncertified personnel whose willful and repeated violations of mine safety laws place miners in imminent danger of serious injury or death.

Reading the clear language of these findings, it is apparent that the legislature mainly intended to protect the safety of miners; although, it also identified continuing economic security of the coal mining industry as another goal in enacting underground mining regulations.

The legislature made more explicit findings in regard to surface mining (also known as "strip mining") stating that "unregulated surface coal mining operations ... in general, create hazards dangerous to life and property" in KRS 350.020. These findings explicitly refer only to surface mining operations; although, it would not be unreasonable to assume that underground mining regulations (such as KRS 352.450) are also aimed at reducing hazards to life and property.

an economic loss resulted from a safety statute violation because we do not find this factor solely dispositive.

 As appellees point out, there is no published Kentucky state case in which an exculpatory clause was invalidated when only property loss (as opposed to personal injury) occurred. But the presence or absence of personal injury is not the sole factor for determining whether an exculpatory clause is valid under Kentucky law. True, exculpatory clauses have been invalidated more frequently in the context of personal injury cases where an individual is often forced to sign a release to obtain a necessity such as medical care or employment from a party in a superior bargaining position. However, exculpatory clauses have been enforced by federal courts applying Kentucky law in regard to personal injuries produced by recreational pursuits on the bases that "the races affected only private interests, that participation was voluntary, that the parties possessed equal bargaining power, and that the races could not continue without such protection from liability." [24]

When our courts have invalidated exculpatory clauses based upon a breach of a statutory duty or breach of a duty to the public at large, those agreements involved a major disparity in bargaining power between the parties. For example, in *Meiman v. Rehabilitation Center, Inc.,*[25] our predecessor court invalidated a release, which an amputee was required to sign before the rehabilitation center would treat her. In doing so, the court stated:

in no event can such an exculpatory agreement be upheld where either "(1) the interest of the public requires the performance of such duties, or (2)[ ] because the parties do not stand upon a footing of equality, the weaker party is compelled to submit to the stipulation." 6 A.L.R.3d 705. In our view, the case at bar is one in which it is clearly against public policy for the Center to seek refuge in the exculpatory agreement.[26]

Similarly, although our decision in *Hargis* does not explicitly discuss the parties' relative bargaining positions, a significant disparity in bargaining positions existed between the parties to that contract. The plaintiff's decedent was an individual truck driver who worked as an independent contractor with the defendant owner of several sawmills.[27] Presumably, the plaintiff's decedent in *Hargis* was required to sign the release at issue before he could deliver logs to the defendant's sawmill and, therefore, was "compelled to submit to the stipulation." So *Hargis* is distinguishable from the instant case. Here, sophisticated corporate entities negotiated the allocation of a jointly shared risk and expressly incorporated that risk allocation into a contract that neither of them was compelled to enter into to obtain a necessity, such as medical care or personal employment.

An early case, holding that parties should not be allowed to contract away liability for violation of a safety statute, noted the imbalance of power between the parties (a coal miner and his employer) and reasoned as follows:

The very fact of such legislation indicates that the lawmakers believed that the operation of the common-law rules did not afford the employé sufficient protection; that, under the development

**24.** *Donegan v. Beech Bend Raceway Park,* 894 F.2d 205, 207 (6th Cir.1990) (*citing Dunn v. Paducah Int'l Raceway,* 599 F.Supp. 612, 613 (W.D.Ky.1984)).

**25.** 444 S.W.2d 78 (Ky.1969).

**26.** *Id.* at 80.

**27.** *Hargis* at 39.

of the modern industrial system, tending to centralization of capital and impersonal management, **the employé did not stand upon a footing of equality with the employer in contracting for his safety;** and that the necessity of earning the daily wage frequently constrained the employé to put up with defective place and tools without complaint, by reason of his fear of the consequences of complaining. From these conditions grew the necessity, or at least the propriety, of requiring certain specific measures to be taken for the protection of employé's.... A definite standard was fixed by the legislature.... If the employer may avail himself of the defense that the employé agreed in advance that the statutes should be disregarded, the court would be measuring the rights of the persons whom the lawmakers intended to protect by the common-law standard of the reasonably prudent person, and not by the definite standard set up by the legislature.[28]

We find no suggestion that these parties were not on "a footing of equality" or that Cumberland Valley or Del Rio belonged to a class of persons that the legislature attempted to protect by setting a more definite standard. Rather, since these parties were "dealing at arm's length and upon an equal footing," the effect of Paragraph 30 is "not so much that [Bell County Coal] contracts against its own negligence as that [Cumberland Valley and its assignee, Del Rio] agree[ ] to

alone bear all risks from" flooding.[29] Cumberland Valley and Del Rio received consideration for agreeing to bear the risks of flooding, and "[w]e cannot see that the public are in any wise affected by such a contract[.]"[30] Given that the clause at issue was negotiated as part of an arm's-length transaction between two business corporations with presumably equal bargaining power, we find no compelling reason to disturb their written contract.

> [C]ontracts voluntarily made between competent persons are not to be set aside lightly. As the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts is to enforce and maintain contracts rather than to enable parties to escape their obligations on the pretext of public policy or illegality. If the legality of the contract can be sustained in whole or in part under any reasonable interpretation of its provisions, courts should not hesitate to decree enforcement.[31]

Kentucky courts have long upheld exculpatory clauses in arm's-length transactions between sophisticated parties with equal bargaining power and allowed such parties to bargain against liability for their own negligence and even gross negligence "short of willfulness and wantonness."[32] Cumberland Valley and Del Rio have failed to show where they have alleged willful or wanton negligence in the record[33] (other than baldly asserting with-

28. *D.H. Davis Coal Co. v. Polland,* 158 Ind. 607, 62 N.E. 492, 495–96 (1902) (emphasis added.).

29. *Jones v. Hanna,* 814 S.W.2d 287, 289 (Ky. App.1991), *quoting Greenwich Ins. Co.,* 66 S.W. at 413.

30. *Greenwich* at 413.

31. *Jones,* 814 S.W.2d at 289 (*quoting Zeitz v. Foley,* 264 S.W.2d 267, 268 (Ky.1954)).

32. As explained in *Donegan,* 894 F.2d at 207 n. 1, the *Greenwich* rule was misstated in dicta to prohibit contracting against liability for gross negligence in *Cobb,* 145 S.W.2d at 99 (wherein only ordinary negligence was at issue).

33. Cumberland Valley and Del Rio pleaded gross negligence in their amended complaint. But they have failed to cite to any portion of the record in which they claimed willful or

out citing appropriate authority that any failure to comply with statutory duties necessarily shows willful or wanton negligence). So, since willful or wanton negligence was not at issue, this Court finds no reason to invalidate the exculpatory clause at issue and, thus, reverses the holding of the Court of Appeals on this issue and the judgment of the trial court.

## IV. CONCLUSION.

Having concluded that Bell County Coal timely appealed to the Court of Appeals and that the exculpatory clause bars Cumberland Valley's and Del Rio's claims altogether, we reverse the decision of the Court of Appeals and judgment of the Bell Circuit Court. All other issues raised by the parties are rendered moot by our decision.

All concur.

SCOTT, J., not sitting.

wanton negligence. Willful or wanton negligence is distinguishable from gross negligence under Kentucky law. Gross negligence signifies "the absence of slight care." *Donegan*, 894 F.2d at 207, *citing McTavish v. Chesapeake & O.R.R.*, 485 F.2d 510, 512 (6th Cir. 1973). Willful or wanton negligence signifies "the entire absence of care for the life, person or property of others[]" with "an element of conscious disregard of the rights or safety of others, which deserves extra punishment in tort." *Donegan* at 207, *citing Louisville & N. R.R. v. George*, 279 Ky. 24, 29, 129 S.W.2d 986, 988–89 (1939).