**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0186n.06

Case No. 16-5559

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 27, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RQSI GLOBAL ASSET ALLOCATION MASTER FUND, LTD, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| APERCU INTERNATIONAL PR LLC and ALVIN WILKINSON, | ) ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: COLE, Chief Judge; BOGGS and SILER, Circuit Judges.

**SILER**, Circuit Judge. Plaintiff RQSI Global Asset Allocation ("RQSI") appeals the dismissal of its diversity complaint alleging gross negligence, fraud, and breach of contract for failure to state a claim under Fed. R. Civ. P. 12(b)(6). We **REVERSE** in part, **AFFIRM** in part, and **REMAND** for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

RQSI is an investment fund that entered into a Trading Advisory Agreement ("TAA") with Defendant Aperçu International PR LLC ("Aperçu") in January 2015. Defendant Alvin Wilkinson is a principal and the controlling manager of Aperçu. The TAA limited any potential liability of the Defendants to losses stemming from gross negligence or willful misconduct. Upon signing the TAA, the parties began implementing the agreed-upon trading strategy, with

RQSI initially conducting the trading activity and Aperçu serving in an advisory capacity. In April 2015, Aperçu began managing assets directly and assumed control over investment decisions.

The parties' strategy involved trading stock futures and options on margin. This meant the portfolio contained a number of options spreads. Each spread involved buying a short-term option and selling a long-term option for the same commodity or security or vice-versa (selling a short-term option and buying a long-term option). The goal of the investment strategy was to profit from the difference between the prices of the short- and long-term options making up each spread. Trading on margin means an investor uses borrowed money from a custodian bank for a portion of trading funds. Here, the TAA allocated responsibility for making such a custodial arrangement to RQSI, and RQSI established a margin trading account with Société Générale Americas Securities, LLC ("Société Générale"). To maintain a margin account, the equity investment must always equal a preset percentage of total invested assets. This percentage is contractually determined between the investor and the custodian bank. If some investment assets decline in value, the custodian bank may demand that additional equity be placed in the account to meet the contractual percentage requirement. This demand is a margin call.

The initial margin limit in the TAA was $1,000,000 and Aperçu was to "make best efforts to reduce risk and/or execute hedging trades in order to bring the margin below the Margin Limit within 1 business day" should the $1 million threshold be exceeded. About one month after the trading strategy was implemented, RQSI informed Wilkinson that additional risk exposure should not be taken on, that the account would be closed at the end of the calendar year, and that the margin amount was to be kept in the $600,000-$700,000 range that existed at that time.

Volatility in options markets during late June and early July 2015 triggered a first margin call by Société Générale which RQSI met. Margin first exceeded the $1 million TAA limit in mid-July and RQSI sent notice of the breach to Aperçu. At that time Wilkinson allegedly told RQSI that the increase was temporary and due to volatility in the mark-to-market valuation of options and additional hedging necessary to preserve gains. On the last day of June, the number of spreads contained in the portfolio was between 6,000 and 8,000, roughly the same number of positions contained in the portfolio during April and May. The margin amount briefly dropped below the $1 million threshold, but then rose back above it and continued to rise during the rest of July and into August. During this period, RQSI alleges that Aperçu materially altered the trading strategy to avoid hedging trades and instead doubled down on existing positions. By August 24, the portfolio contained approximately 25,000 spreads.

On August 10, the portfolio reached its highest cumulative profit level but was allegedly much more exposed to a downward shock in equity markets. On August 24, the S&P 500 dropped 5% and the portfolio lost $10 million in value. By August 28, the portfolio had lost an additional $4 million in value despite a market rebound. The possibility of yet further losses led Société Générale to issue a second margin call, this time for $42.6 million. This amount was based on the account's 5-day 99.8% confidence Value-at-Risk ("VaR"), a statistical technique measuring risk—a 99.8% VaR means that in 99.8% of 5-day observation periods the portfolio could be expected to lose no more than that amount. Both 99.8% and 99% VaR levels showed significant increases through July and experienced a major spike in mid-August. The TAA itself did not incorporate any VaR requirements but instead only addressed initial margin requirement ("IMR"), a measure based solely on the total amount of invested funds without incorporating any projections. At the time of the second margin call, IMR was almost $4 million. The

$42.6 million margin call resulted from RQSI's agreement with Société Générale requiring RQSI to post the greater of the VaR or the IMR to maintain the margin trading account. When the second margin call was made, RQSI terminated Aperçu's power of attorney, borrowed money in order to meet the margin call, and began the process of liquidating the portfolio. This lawsuit then followed.

RQSI alleges it was harmed by gross negligence, fraudulent representations, fraudulent omissions, and breaches of contract. The case reaches us after the district court granted Defendants' motion to dismiss all claims under Rule 12(b)(6). Specifically, the district court held that the amended complaint did not allege the requisite malice needed to meet the standard for gross negligence so there could be no liability under the terms of the TAA. The district court separately ruled that any liability for "margin-related payments required to maintain the margin account" was also waived in the TAA.

## STANDARD OF REVIEW

We review a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) de novo. *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016). When reviewing a motion to dismiss, we must accept the plaintiff's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *See Dubay v. Wells*, 506 F.3d 422, 427 (6th Cir. 2007). To overcome a motion to dismiss, a plaintiff must do more than make conclusory allegations that the defendant violated the law. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). At the motion to dismiss stage, a plaintiff must allege enough facts in the complaint that the claims for relief are plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When a plaintiff asserts a claim for fraud, the plaintiff must plead with particularity

the circumstances constituting the fraud but may plead malice or intent generally.  Fed. R. Civ. P. 9(b).

## DISCUSSION

### I.      Gross Negligence

Under Kentucky law, a gross negligence claim requires that the defendant acted with "malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed that the act was malicious or willful." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003) (citation omitted).  Liability for a gross negligence claim must be predicated on an extra-contractual duty.  *See Mims v. W.-S. Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007).

As the district court properly analyzed, whether an investment advisor has a fiduciary duty depends on the nature of the customer's account and the amount of control exercised by the advisor.  *See J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 907 F.2d 150 (6th Cir. 1990) (unpublished table decision).  Here, a fiduciary relationship was created when Aperçu assumed discretionary control over investing and RQSI approval was no longer required for Aperçu to trade.  This imposed on Aperçu "an affirmative duty of 'utmost good faith, and full and faithful disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' [RQSI]."  *SEC v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963)).

The district court dismissed the gross negligence claim based on a finding of insufficient allegations of malice or willfulness given the parties' fee arrangement.  The TAA provided for no management fees, and Aperçu would receive 20% of any gains while receiving and risking nothing in the event of losses.  Since Aperçu stood to gain financially only if the investment

strategy succeeded and RQSI also profited, the district court determined that Aperçu's actions could not support a finding of malice. The analysis of the existence of malice cannot end with discussing only the parties' fee arrangement, however, since RQSI generally averred malice three times in its amended complaint.

Malice relates to intent and people can have motivations other than money. To support its general allegations of malice, RQSI avers facts suggesting Defendants acted out of vindictiveness. According to the amended complaint, the following occurred: RQSI informed Wilkinson that it wished to terminate the account by year's end; Wilkinson ignored RQSI's instructions to lower the margin amount and instead increased the amount invested and the number of spreads in the portfolio; and Wilkinson provided false and misleading justifications for the rise in margin requirements resulting from his actions. There were spikes in margin requirements, the amount of trading that was occurring, the vega exposure ( vega is a measure of the sensitivity of an option's value based on the volatility of the underlying asset), and VaR at times corresponding to the allegations. If these changes were in direct response to and in contravention of RQSI instructions and Defendants knew or did not care that the probable result was significant capital losses, then a finding of implied malice is plausible. The fact that Defendants stood to gain financially only by realizing trading profits does not preclude a finding of implied malice given the asymmetric risk allocation between the parties. Since Aperçu bore no risk of loss, Defendants had little to lose financially by acting contrary to RQSI's instructions and could have retaliated against RQSI's intention to close the account by guaranteeing losses. Given this possibility, the district court should not have dismissed the gross negligence claim.

## II.      Fraudulent Misrepresentation

When a plaintiff brings a fraud claim, Fed. R. Civ. P. 9(b) mandates that the plaintiff "state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  If a relevant claim fails to meet the requirements of Rule 9(b), then it must be dismissed.  *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 253 (6th Cir. 2012).  Under Kentucky law, a fraudulent misrepresentation claim must establish by clear and convincing evidence:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).  Mere statements of opinion and forward-looking recommendations are not actionable, even if misguided or overly optimistic, unless the opinion "either incorporates falsified past or present facts or is so contrary to the true current state of affairs that the purported prediction is an obvious sham."  *Id.*  While a sophisticated party cannot benefit from the obvious-sham exception, it can benefit from the falsified-fact exception.  *See Republic Bank & Trust Co.*, 683 F.3d at 250.  The falsified-fact exception is key in analyzing these claims.  There is little Kentucky case law demarcating this exception, but the Kentucky Supreme Court has endorsed an approach requiring objectively false data for the exception to apply.  *See Flegles*, 289 S.W.3d at 550.  RQSI alleges three statements made by Wilkinson to have been fraudulent, and the district court considered and rejected each.

### a.  Statement of No Increased Risk

The first alleged fraudulent misrepresentation is based on Wilkinson's statements to the effect that the rise in the margin requirement beyond the agreed-upon limit and the higher-than-expected volatility of the portfolio throughout July and August 2015 did not reflect an increase in

risk but was merely a temporary issue caused by volatility in the mark-to-market valuation of options and additional hedging needs necessary to preserve gains. RQSI alleges that the rise in the margin requirement and higher market volatility did in fact correspond with higher risk and that the risk had increased to such an extent after the first margin call that saying there was only an apparent increase in risk related to volatility was fraud. The district court found the statements to be subjective opinions unconnected to any concrete factual statement and dismissed the claim.

RQSI claims that statements about the structure of the market and the nature of the risk can be actionable misrepresentations. *See First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987). *Weinberger* involved an unsophisticated plaintiff and a defendant who stated that he had never lost money and that the maximum the plaintiff could lose would be $25,000 out of his $70,000 investment. *Id.* at 1337-38. The increased risk statement in this case is not nearly as specific, RQSI is a sophisticated entity, and RQSI knew the investment strategy was risky as set forth in § 7(f) of the TAA.

Whether these statements are actionable depends largely on whether risk can be sufficiently quantified to make it factual and not an opinion about relative risk. The district court was convinced that risk (here defined as probability of loss) could not be objectively measured and dismissed the claim. Even granting RQSI all reasonable inferences, the district court was correct as these statements do not contain a sufficiently definite factual assertion. They read most naturally as an opinion about relative risk, something which both parties knew was already high. Even accepting one of the measures used by RQSI to assess risk as probability of loss (i.e., VaR), there is no suggestion as to when the magnitude of risk changed sufficiently to make the statements misrepresentations. The claim was properly dismissed.

b. **Internal Reports of an "Embedded Tail Hedge"**

The second fraudulent misrepresentation claim in the amended complaint was predicated upon the statement by Wilkinson that internal Aperçu risk reports supported the claim that the investment strategy contained an "embedded tail hedge" such that it would be profitable in a large market downturn. RQSI alleges that Aperçu's investment strategy did not contain an "embedded tail hedge" and thus the statement was materially false as to the structure of the investment strategy. In support of this allegation, RQSI stated that risk reports conducted by outside analysts concluded that Aperçu's reports must have been false and on this basis RQSI seeks the application of Kentucky's falsified-fact exception. Whether the portfolio contained positions constituting a tail hedge is sufficiently definite and ascertainable in a way that the other alleged misrepresentations are not, even if a tail hedge would not incorporate the same positions in every portfolio.

The difficulty in assessing this claim is the nature of the statement: it was not a representation concerning the makeup of the portfolio directly but instead relayed the contents of internal Aperçu reports. There is no allegation that the reports themselves were misrepresented, and on this ground the district court ruled the statement not actionable as merely being the relaying of what turned out to be unsound reports. This analysis is incomplete under the falsified-fact exception. It is not, as Defendants assert, a requirement that Wilkinson misrepresented the reports for this statement to be actionable. If that were the case, it could incentivize the creation of erroneous nonpublic reports for the purpose of avoiding potential liability for fraudulent representations therein by phrasing statements as simply relaying the contents of those reports. The falsified-fact exception was created to prevent exactly those types of activities. Taking as true the allegation that risk reports by outside experts show that Aperçu's

internal risk reports could not possibly have been factually accurate, the analysis hinges on the plausibility of Wilkinson's knowing the reports to be false yet relaying their contents anyway to assuage RQSI's worries about a potential large downturn in equity markets. RQSI makes the allegation that this was the case, and we must accept that allegation as true for the purposes of considering the motion to dismiss. RQSI also alleges that had it known the portfolio did not contain a tail hedge, it would have terminated the trading agreement and avoided the losses occurring after the statement was made, meeting the other elements necessary to plead a claim for a fraudulent misrepresentation. This claim should not have been dismissed.

### c. Statement that "Ample Liquidity Existed"

The third alleged fraudulent misrepresentation was a recurring statement that ample liquidity existed in the long-volume portion of the portfolio such that the portfolio could be wound down efficiently within a few weeks. The allegation is that the options in the portfolio were illiquid to the point of achieving only paper gains which could never be realized. There is some disagreement as to the meaning of liquid, and the district court based its dismissal of this claim largely on what it saw as a lack of a clear definition. There is no allegation that these statements were based on any particular technical measurement of liquidity, and no technical measure is offered in the amended complaint. There is also no attempt in the complaint to define what "efficiently" should mean in relation to winding down the portfolio. The allegation is that instead of there being "ample" liquidity, the options were in fact "extremely" illiquid. The emphasis RQSI places on these modifiers dooms this claim as they are only matters of degree and not objective facts that would qualify as representations. The claim was therefore properly dismissed.

### III.    Fraudulent Omission

To bring a claim for fraudulent omission under Kentucky law, a plaintiff must show that "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). The alleged omissions must pertain to material facts, *Mitchell v. General Motors LLC*, No. 3:13-cv-498, 2014 WL 1319519, at *12 (W.D. Ky. Mar. 31, 2014), and the plaintiff must comport with the heightened pleading standards imposed by Fed. R. Civ. P. 9(b). To comport with Rule 9(b) for a fraudulent omission claim, a plaintiff must plead: "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the fraudfeasor(s)] obtained as a consequence of the alleged fraud." *Republic Bank & Trust Co.*, 683 F.3d at 256.

The district court determined that Aperçu had a duty to disclose based on the existence of a fiduciary relationship. This is not disputed on appeal. The issue is whether the alleged omissions pertained to material facts. The district court correctly determined that none of the allegations involves a fact and did not err when it did not reach the separate question of materiality.

The first alleged fraudulent omission concerned the risk profile of the portfolio. Specifically, RQSI alleges that during July and August Wilkinson was aggressively increasing the amount of risk contained in the portfolio. The district court properly dismissed the claim based on its determination that risk (defined here again as the probability of loss) cannot be sufficiently quantified to constitute a fact. This was always a risky investment strategy, as set

forth in TAA § 7(f), and RQSI offers no way to clearly demarcate the level of risk at which the portfolio fundamentally changed so as to be a fact that could have been omitted. RQSI seeks to avoid the fact/opinion hurdle here by equating risk and margin. If risk here means margin, then this claim is duplicative of a breach of contract claim, and if risk does not mean margin, then the alleged omission did not concern an objective fact. Even were we to accept RQSI's framework, we would still dismiss this claim.

The second alleged fraudulent omission was that Wilkinson failed to disclose that he was amassing excessively large positions in several of his largest holdings as a percentage of open interest and thereby further increasing the chances that RQSI would face tremendous losses. This claim presents a closer question than the first because RQSI avers that a single position constituted 90% of the total market holdings of the portfolio. As a fiduciary, Wilkinson was under an affirmative duty of good faith and full disclosure. If RQSI was giving instructions to wind down the portfolio, then Wilkinson's failure to disclose the fact that Aperçu was doubling down on existing investments may have been a breach of fiduciary duty.

As the district court properly held, however, this alleged omission is also insufficiently concrete to be actionable. There is no proposed objective measure against which a factfinder could determine whether a position was *excessively* large. Chart 10 attached to the amended complaint goes some way toward quantifying this alleged omission by illustrating the relative allocation of various positions in the portfolio but does not remedy the lack of an objective measure or baseline. It indicates that certain positions in the portfolio were weighed much more heavily than others. This alone is insufficient to trigger any duty to notify. If the large positions were entered into after RQSI's express instructions to wind down the portfolio as alleged, that

does not raise a claim for fraud by omission but instead a claim for gross negligence as alleged elsewhere in the amended complaint.

The third alleged fraudulent omission was that Wilkinson manipulated the market for certain options to maintain short-term paper profits without informing RQSI that these profits could never be realized. The district court correctly dismissed this claim as being overly conclusory. Absent an iron-clad guarantee that the options must be sold without realizing the alleged paper profits, of which there is no allegation in the amended complaint, this claim does not rise to the level of being a fact that could have been fraudulently omitted. This claim is supported only by assertions of illiquidity and relative weighting that are individually and in concert insufficient to state a claim for fraudulent omission.

## IV. Breach of Contract

To establish a breach of contract claim under Kentucky law, a plaintiff must show "the contract, the breach and the facts which show the loss or damage by reason of the breach." *Shane v. Bunzl Distribution USA, Inc.*, 200 F. App'x 397, 402 (6th Cir. 2006) (quoting *Fannin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky. 1952)). The TAA is the governing contract, and in § 8 it expressly limits Aperçu's liability to losses caused by gross negligence or willful misconduct. The district court, relying on its earlier analysis dismissing the stand-alone gross negligence claim, determined that gross negligence and willful misconduct were alleged in only conclusory terms for the breach of contract claims and dismissed them. Since the duties upon which the claims are based are different, it was improper to dismiss the breach of contract claims solely on this basis even if we agreed with the district court as to the gross negligence claim. The amended complaint is sufficient to state a claim for breach of contract even taking into account the contractual limitation on Defendants' potential liability.

### a. Margin Requirement Limit

The first alleged breach is of the IMR limit incorporated into the TAA lasting from July 10 through the cancellation of Aperçu's power of attorney despite repeated requests by RQSI that Aperçu achieve compliance. After crossing the $1 million TAA limit on July 10, the IMR briefly decreased to below the TAA limit, but then began increasing again and continued to rise during the remainder of the time the agreement was operative. By August 25, the IMR was nearly $4 million while the TAA limit remained $1 million. Aperçu suggested in its briefing and at oral argument that the $1 million limit was not intended as a hard cap and that RQSI's sole remedy for a breach of this provision was immediate termination of the agreement, but the contractual language belies these assertions. The specific provision of the TAA setting forth the margin requirement limit contains only passive language regarding RQSI's potential remedy: "[f]ailure by [Aperçu] to maintain margin below the Margin Limit may result in the allocation being temporarily suspended or permanently terminated by [RQSI]." RQSI could already terminate the agreement at will, so this was not even an additional remedy, much less an exclusive one. And while the TAA contemplated increasing the IMR, there was no requirement that this occur and the agreement is clear that RQSI maintained control over setting the IMR amount. Aperçu also contends that any breach of this provision was waived by RQSI, but the relatively short time period involved in this case and viewed in the light most favorably to the complaint, RQSI's claim that it repeatedly instructed Aperçu to comply with the $1 million limit mean that RQSI did not waive any right to enforce the IMR limit.

Since the IMR was nearly $4 million when the agreement was terminated, a breach of the TAA clearly occurred. The more difficult inquiry is whether this breach plausibly rose to the level of gross negligence or willful misconduct. If, as alleged in the amended complaint, Aperçu

knowingly engaged in trades to continue to increase the IMR in direct contravention of the TAA's provisions and specific repeated instructions from RQSI, whether in retribution for RQSI's decision to close the account at year's end or for some other reason, then this plausibly rises to the level of gross negligence or willful misconduct required to sustain liability under the TAA. Therefore, the district court should not have dismissed this claim.

### b. Investment Objectives

The second alleged breach of contract is of a provision requiring Defendants to perform "in a manner which, in the reasonable judgment of [Aperçu] is designed to achieve the investment objectives of [RQSI], and which is consistent with the trading program, policies and strategies identified in writing to [RQSI]." This provision imposes two requirements: that Aperçu's actions be reasonably designed to achieve RQSI's objectives; and that those actions comply with the written materials provided to RQSI by Aperçu. The specific allegation is that Defendants failed to comply with RQSI's instructions and so failed to fulfill the first requirement imposed by this provision.

For this claim to survive the motion to dismiss, there must be sufficient allegations that Defendants were either not attempting to achieve the investment objectives of RQSI or not exercising reasonable judgment in doing so. Since RQSI's instructions must be taken into consideration under this provision, allegations that Defendants ignored or actively undermined RQSI goals must be taken as true. If the alleged course of action involving direct contravention of RQSI's explicit instructions not to increase the size of the portfolio occurred, then Aperçu did not exercise its reasonable judgment to achieve RQSI's goals. It is not enough to dismiss the claim that Aperçu would not profit financially from such a course of action, as actors can have

multiple motivations and the amended complaint creates the inference that spite might have been the primary driver of Defendants' actions. This claim should not have been dismissed.

### c. Notification of a Change in Strategy

The third alleged breach of contract is of a provision requiring Aperçu to "promptly notify [RQSI] . . . of any material changes in the trading approaches or strategies to be utilized in connection with its management of the Assets." This obligation is unconditional and RQSI's knowledge of any alteration in trading approach is immaterial in analyzing whether a breach occurred. At this stage, we must accept as true RQSI's allegations both that there were material changes in the trading approach and that Aperçu did not notify RQSI when the changes occurred. These two allegations, taken together, are sufficient to constitute a breach of the TAA, but that does not end the inquiry.

Defendants argue that, even accepting these allegations as true, failure to meet a notification requirement cannot be gross negligence or willful misconduct. Considered in the light most favorable to RQSI, the failure to notify was part of a concerted effort on the part of the Defendants to conceal the nature of their trading activities. Defendants counter by claiming that RQSI had full access to the information at issue so that gross negligence did not occur. Whether RQSI had access to the information is not dispositive, however, since the contractual obligation made no reference to RQSI's being able to obtain information regarding potential changes to the investment strategies deployed through some other means and there was no obligation placed on RQSI to do so. If RQSI can prove at trial that Aperçu's failure to notify RQSI as required by the TAA was part of a scheme to conceal improper activities, then RQSI can prevail on this claim. This claim should therefore not have been dismissed.

**d. Compliance with Applicable Laws**

The briefing also addresses a newly-alleged breach based on information that came into existence while this appeal was pending. On June 28, 2016, the Commodity Futures Trading Commission ("CFTC") filed suit against Defendant Wilkinson for fraudulent trading activities. That complaint alleged that Wilkinson willfully or recklessly made misrepresentations concerning the likelihood of profit and risk in commodity pools and that when investors notified Wilkinson of their intent to withdraw from the commodity pools, he engaged in delays and lied saying he was unable to disburse funds. The CFTC complaint is relevant to this case because in § 6(f) of the TAA Aperçu warranted that "[i]t and each of its principals [including Wilkinson] and employees is, and throughout the term of this Agreement will remain, in compliance, in every material respect, with any and all applicable laws and regulations, including applicable provisions of the Commodity Exchange Act . . . [and] regulations of the CFTC promulgated thereunder . . . ." RQSI moved for us to take judicial notice of those judicial proceedings under Fed. R. Evid. 201, and we grant the motion because the judicial filings in those proceedings are from sources whose accuracy cannot reasonably be questioned. In the CFTC proceedings, a judgment has been entered that Wilkinson violated the Commodity Exchange Act, and the district court imposed a permanent injunction against Wilkinson's engaging in commodities trading. *CFTC v. Wilkinson*, No. 1:16-cv-06734 (N.D. Ill. Nov. 22, 2016).

RQSI asserts that it should be granted leave to amend its complaint to assert this new breach of contract claim on remand. The case cited by Defendants does not squarely address the issue, as it involved new factual allegations that existed at the time the complaint was filed and were inconsistent with the original complaint. *See Garcia v. City of Oakwood*, No. 95-4012, 1996 WL 593602, at *4 (6th Cir. Oct. 15, 1996) (per curiam). The present situation does not

mirror *Garcia*, as the CFTC complaint was not filed until the district court proceedings ended. This scenario also does not square entirely with the *Bridgestone* case briefed by RQSI either since that case involved forum non conveniens and what turned out to be a false assumption as to the availability of an alternate forum. *See In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 705-06 (7th Cir. 2005). The *Gomez* case cited by RQSI is most apropos, as it addressed new information brought to light after the case left the district court. *See Gomez v. Wilson*, 477 F.2d 411, 416 (D.C. Cir. 1973). There, the District of Columbia Circuit thought the new information was sufficient to allow the plaintiff to supplement his claims on remand as a potential predicate for additional relief in light of the new information. *Id.* Here, new information has come into existence suggesting Defendant Wilkinson was in breach of a separate provision of the TAA after the conclusion of proceedings before the district court.

The parties further dispute whether any breaches were material and whether the contractual language applied only to Defendants' interactions with RQSI or extended to include all trading conducted by Defendants. We need not adjudicate these disputes for the first time on appeal. Whether this claim should be allowed should first be considered by the district court as a motion to amend the complaint under Fed. R. Civ. P. 15(a)(2) which provides that district courts should freely grant leave to amend when justice so requires.

## V.     Damages

In its amended complaint, RQSI alleges a range of damages, including but not limited to:

loss of invested funds, adverse impact on profit and loss resulting from the breach of the agreed upon margin and VaR constraints, losses resulting from the VaR margin call, potential future losses from continued exposure during the process of liquidating the Fund's portfolio, additional trading costs incurred in an attempt to mitigate damages, effects of any market impact that Aperçu and Wilkinson's improper trades may have had on pricing, opportunity costs from redeployed capital from or to other investments, lost time and resources related to managing

and liquidating the portfolio after revoking Aperçu's Power of Attorney, and foregone management fees.

Under the terms of the TAA, RQSI can only recover damages that result from the gross negligence or willful misconduct of the Defendants. In Kentucky, gross negligence is the "absence of slight care" and willful or wanton negligence is "the entire absence of care for the life, person or property of others" and includes "an element of conscious disregard of the rights or safety of others, which deserves extra punishment in tort." *Cumberland Valley Contractors, Inc. v. Bell Cty. Coal Corp.*, 238 S.W.3d 644, 654 n.33 (Ky. 2007) (quoting *Donegan v. Beech Bend Raceway Park, Inc.*, 984 F.2d 205, 207 (6th Cir. 1990)).

The district court made a series of rulings on the availability of damages but did not clarify how such damages related to the categories listed in the amended complaint. It ruled simply that RQSI waived losses related to the maintenance of the margin account under § 2 of the TAA. RQSI appeals this ruling, and the parties also dispute its scope—whether it covers losses resulting from the VaR margin call or also losses from the breach of the agreed-upon margin and VaR constraints, potential future losses and additional trading costs in liquidating the portfolio to meet the margin call, and lost time and resources spent liquidating the portfolio. The district court expressly declined to rule on whether the categories of damages alleged related to the margin call. The district court also dismissed the damages claim for the "effects of any market impact that Aperçu and Wilkinson's improper trades may have had on pricing," calling these damages too speculative to be recoverable.

Under Kentucky contract law, sophisticated parties with similar bargaining power may include exculpatory provisions that preclude certain claims or damages. *See Cumberland Valley Contractors*, 238 S.W.3d at 649-51. When interpreting contractual provisions, more specific provisions govern over general provisions. *See, e.g.*, Restatement (Second) of Contracts § 203(c)

(1979) ("specific terms and exact terms are given greater weight than general language").  Courts are obligated to read contractual clauses as parts of an integrated whole and embrace an interpretation that results in harmony between provisions when possible.  *See Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir. 2012).  An interpretation that gives a reasonable, lawful, and effective meaning to all contractual terms is preferred over a reading that would nullify a provision.  *See* Restatement (Second) of Contracts § 203(a) (1979).

The TAA includes two provisions that address the availability of damages related to the margin account.  The first is an exculpatory provision found in § 2, entitled "Maintenance of the Assets," and reads:

> [Aperçu] shall have no liability to [RQSI] for any loss, damage, cost or expense arising out of or related to the use of any such . . . bank as a custodian of the Assets, or for the payment of any fees or margin related to such trading or custody arrangements, all of which shall be the responsibility of [RQSI].

The other relevant provision is found in § 8, entitled "Liability of the ADVISOR." It says that "[a]ll transactions in options and futures . . . shall be for the account and risk of [RQSI]" and:

> Neither [Aperçu] nor any of its officers, employees, affiliates or agents shall be liable to [RQSI] for any losses sustained in connection with [transactions in options and futures], or for any errors, acts or omissions committed by the [futures commission merchants], the Dealers, or other third parties, unless caused by the gross negligence or willful misconduct of [Aperçu], its officers, employees, affiliates, or agents.

The parties dispute which provision takes precedence, with the briefing focused on the general/specific distinction.  RQSI posits that § 8 contains a specific carve-out from the general exculpatory language of § 2, while Aperçu asserts that § 2 is more specific since it enumerates categories of damages.  The district court found the language in § 2 to be the more specific provision and so held that it governed over the language in § 8.  It reasoned that since § 2 deals

with maintenance of the assets and specifically references using a bank as a custodian for the account, it is controlling.

The district court correctly held that § 2 is the more specific provision. Looking at the titles of the two relevant provisions, § 2 is specifically about maintaining the assets and § 8 is about liability generally. Section 2 allocates to RQSI the responsibility for making the custodial arrangements with a bank. It makes clear that Aperçu would not be involved in any such arrangements except that RQSI was required to ensure the third parties would accept Aperçu's trading instructions. Section 8 keys in on transactions in options and futures; it is not focused on the contractual relationships needed to support those trading activities. The net effect of these provisions is to largely remove the relationship between RQSI and Société Générale from the scope of the TAA.

The parties dispute whether reading § 2 to preclude damages related to or arising from the margin account would render part of § 8 meaningless or whether reading § 8 to govern renders the waiver in § 2 meaningless. The focus of this dispute is on the provision in § 8 that allows the recovery of damages caused by "any errors, acts or omissions committed by the FCMs, the Dealers or other third parties." This is a separate clause from the one providing for liability based on the actions of Aperçu itself. RQSI presses the argument that this clause is a carve-out from the waiver in § 2. The district court, in interpreting § 2 as controlling, held that this reading did not render any part of § 8 meaningless since that language still covered trading losses and held this was the only way to give meaning to both sections. Aperçu adds in its briefing an argument that if it is liable for any damages upon a showing of gross negligence or willful misconduct, this would nullify the waiver contained in § 2. RQSI's counter is that the language in § 2 waived recovery for payments to banks other than those resulting from gross

21

negligence or willful misconduct. We find that neither proposed interpretation would render the other section entirely meaningless. Should § 2 control, then the language in § 8 still applies to actions taken by those third parties in relation to trading activities. If we were instead to hold that § 8 controls, then the language in § 2 would still preclude recovery of ordinary fees unrelated to the actions of the Defendants. As a result, this line of argument does not alter the conclusion that § 2 governs based on its relative specificity.

The next step is determining which alleged damages are precluded by the TAA waiver. Kentucky law dictates that any exculpatory clause should be narrowly construed and that the wording of a release from liability must be unmistakable and clear so that a knowledgeable party would know what he is contracting away. *See Cumberland Valley Contractors*, 238 S.W.3d at 649. The district court did not rule on the scope of the waiver, holding the following:

> Neither party provides sufficient argument as to why or why not certain alleged damages derive from the relevant margin call. Instead, both offer terse and conclusory statements about whether these damages are derivative. This is insufficient for the Court to dismiss the claims.

The parties attempt in some detail to specify categories of damages that may be precluded by the TAA waiver. RQSI seeks to limit the waiver's application to losses resulting specifically "from the VaR margin call" while Aperçu contends that the waiver should also preclude liability for damages categorized as losses resulting "from breach of the agreed upon margin and VaR constraints" as it claims those losses also arise out of RQSI's use of Société Générale as a custodian bank.

Kentucky's requirement that a damages waiver be unmistakable guides our analysis. *Cumberland Valley Contractors* illustrates just how clear a waiver must be to preclude damages. There, the waiver expressly covered destruction due to floods (the case arose when a coal mine flooded and became unusable). *See* 238 S.W.3d at 649. The release in § 2 does not explicitly

22

address losses resulting from a breach of the margin limit incorporated into the TAA, but only precludes the recovery of losses resulting from RQSI's separate contract with Société Générale. Should liability be proven, the district court should assess the amount of damages precluded by the TAA waiver (e.g., damages from the VaR margin call) and which damages are recoverable because they stem from another cause. Should the district court find that a particular amount of damages was a result of both the VaR margin call issued by Société Générale and some other cause, then Kentucky's requirement that a damages waiver be clear means that those damages ought to be recoverable.

All the other categories of damages alleged in the amended complaint are recoverable. As for the claim of damages as a result of loss of invested funds, the district court properly determined that such damages were not waived by any provision in the TAA. While it is true that RQSI assumed the risk that losses could exceed the amount initially invested, knew that there were no assurances that profits would be made or losses avoided, and knew that all transactions were for its account and at its risk, the language in § 8 providing for liability in the event of gross negligence or willful misconduct clearly applies to trading losses. Section 8 of the TAA makes clear that RQSI did not assume the risk of gross negligence or willful misconduct when Aperçu traded on its behalf, so to the extent such actions can be proven and damages traced to them, those damages are recoverable. As for the damages claims related to opportunity costs from redeployed capital, lost time and resources related to liquidating the portfolio, and foregone management fees, the district court properly concluded that these are recoverable. If gross negligence or willful misconduct forced RQSI to take over active control of the portfolio in order to liquidate it and minimize losses resulting from Defendants' trading activities, then the

23

time and resources spent doing so could not have been spent conducting other business activities and RQSI should be compensated for this.

The district court was premature in ruling that damages for the effects of any market impact that Aperçu and Wilkinson's improper trades may have had on pricing are too speculative to be recoverable. RQSI cites cases involving other trading improprieties—an antitrust violation where the entire market's prices were manipulated and a securities fraud where damages were measured as the difference between the price of stock as traded and its value if all information had been available—that do not squarely address the options trading involved here. Defendants point to a lack of alleged facts of market manipulation or market effects in the amended complaint and argue that this renders the damages claim implausible. Defendants key in on the phrases "any market impact" and "may have had" from the allegation to say there is more than just an inability to ascertain the extent of damages here but instead an inability to ascertain whether damages even resulted. The alleged facts supporting this damages claim are the illiquidity of options in the long-volume portion of the portfolio and the percentage of invested funds in those options. If these positions were as outsized as RQSI alleges, then it is a reasonable inference that this may have skewed the pricing of options on those commodities/securities. If those positions were improperly entered into by Aperçu, and if RQSI suffered damages as a result of their liquidation, then those damages should be recoverable.

The judgment of the district court is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.