**MARKWELL & HARTZ, INC., Appellant,**

v.

**Charles PIGMAN et al., Appellees.**

Court of Appeals of Kentucky.

Oct. 29, 1971.

Richard C. Ward, Reeves, Barret, Cooper & Ward, Hazard, for appellant.

Cordell H. Martin, Hindman, Gemma M. Harding, Louisville, for appellees.

PALMORE, Judge.

On or about May 23, 1967, Charles Pigman lost the hearing in his right ear while employed as a laborer by the appellant, Markwell & Hartz, Inc., on a reservoir construction project. He continued in the same employment until February of 1968 when the project was finished, following which, on March 28, 1968, he filed a claim for workmen's compensation. Later on he took another construction job with the appellee Greer Brothers and Young, Inc., and while working for that employer on or about October 18, 1968, lost the hearing in his left ear. On July 25, 1969, he filed an amended application for workmen's compensation in which Greer Brothers and Young, Inc., and the Special Fund were joined as defendants.

The administrative proceeding culminated in an award of $44 per week for 425 weeks against Markwell & Hartz, Inc., pursuant to a finding of fact that as the result of Pigman's "May 23, 1967 exposure to loud and sudden noises he is totally and permanently disabled." The award was affirmed on appeal to the circuit court, whereupon Markwell & Hartz, Inc., now appeals to this court.

Our conclusion that the appellant employer is correct in its contention that the evidence was not sufficient to support the board's finding with respect to causation eliminates consideration of other issues.

The claimant testified on two occasions, once on December 9, 1968, and again on August 18, 1969. In the second of these two appearances his testimony was confined to the matter of notice to Markwell & Hartz, Inc., and to the rebuttal of certain testimony to the effect that when he had first complained to his foreman he had attributed his loss of hearing "to a cold settling in his ear." Aside from the medical testimony, which we shall summarize below, the only evidence of any connection between the work and the disability consists of the claimant's testimony on December 9, 1968, which was substantially as follows:

On or about May 23, 1967, "I was drilling with a jack-hammer and I, drilling in rock and after I fooled with it so long, I mean, pavement breakers, jack-hammer, I run them all and I couldn't hear anything. My head started hurting, my right ear, this one here (indicating), roaring, bells a ringing and everything. Still can't hear." He is 38 years old, had never had any injury or any trouble with his hearing, and had never been sick before his loss of hearing. He had commenced working for Markwell & Hartz, Inc., in July of 1966. His previous work for other employers had consisted mostly of driving trucks and had not included the operation of a jackhammer. The loss of hearing occurred suddenly (as distinguished from gradually), and he first noticed it one evening when he was on the way home after using the jackhammer in breaking concrete on the job. He sought medical treatment shortly thereafter. He was laid off by Markwell & Hartz, Inc., in February of 1968, after which he worked four to six weeks for another construction company, and at the time of testifying had been employed by Greer Brothers and Young, Inc., for about four months. He made no mention of the time, occasion or circumstances under which he lost the hearing in his left ear, nor did he indicate the extent and duration of his exposure to noise while employed by either Markwell & Hartz, Inc., or Greer Brothers and Young, Inc. (Testimony in this respect by representatives of Markwell & Hartz, Inc., suggests that Pigman used a jackhammer sporadically and that most of this type of work was done during a 2-week period in March of 1967.)

Dr. Joseph A. Ballard, of Lexington, a specialist in otorhinolaryngology, testified that he had examined the claimant on November 8, 1968, at which time he was complaining of deafness and ringing and roaring in his ears. The case history related

to Dr. Ballard by Pigman was that about a year and a half previously, after working around loud equipment, he had experienced impaired hearing in the right ear and thereafter had been unable to hear out of that ear; that he had been using a jackhammer at the time and was advised to avoid further exposure to loud noises; and that about a month prior to the examination, after working around road construction, and following some kind of an explosion, he had marked and persistent ringing and roaring with continued inability to hear and was unable to carry on his work.

Dr. Ballard found that although Pigman's ear drums were intact and there were no visible signs of damage or deterioration, something had interfered with the functioning of the nerve that supplies the hearing and he was virtually deaf. On the critical question of causation Dr. Ballard testified as follows:

Q. "Is it then, doctor, your opinion that this disability and everything is the result of an exposure to the use of a jackhammer?"

A. "Such disability could have resulted from such an exposure in one who is hypersensitive to loud noises."

Q. "From your examination of Mr. Pigman, would you say that he was hypersensitive?"

A. "Well, his history would tend to indicate that he was.

\* \* \* \* \* \*

Q. "Is it your opinion—excuse me for repetition here; I think you have answered my question—is it your opinion then that the injuries complained of here were as a result of use and exposure to the jackhammer noises while he was working for the defendant?"

A. "Such an impairment could have resulted from such an exposure."

Attached to Dr. Ballard's deposition is his written report to counsel for Markwell & Hartz, Inc., which concludes as follows:

"Since I did not examine him originally I am unable to state whether or not the impairment of hearing which he gives a history of was due to the exposure to loud noises while working. It is further my opinion that such exposure could have resulted in his present findings."

Dr. Arnold B. Combs, a specialist in otology and associate professor on the subject of otolaryngology at the University of Kentucky Medical School, examined Pigman on October 18, 1968, and again on March 17, 1969. As in the instance of Dr. Ballard, he found a profoundly disabling nerve type of hearing impairment. His opinions with respect to the cause of this difficulty are contained in the following excerpts from his testimony for the appellant employer:

Q. "What history did you receive from Mr. Pigman when you initially saw him on October 18, 1968?".

A. "He gave a history at this time of having developed a sudden hearing loss in his right ear one year prior to presenting himself here. He told me that a cold preceded this hearing impairment and that the hearing had not returned in the right ear. He also stated that he had developed a sudden hearing loss in his left ear about two or three days prior to coming in here on October 18th, and that a cold preceded this loss.

"Treatment at both times did not help. He had no pain, no drainage from his ears, but stated that he was operating a jackhammer at the time of the loss in his right ear. Now he made no comment in regard to operating a jackhammer at the time of the loss in the left ear, but I may not have interrogated him adequately about that.

"He gave no history of headache; no double vision; no evidence of anything that might have been of central nervous system origin."

\* \* \* \* \* \*

Q. "Dr. Combs, did you form an opinion as to the reason for his hearing loss in the right ear, which historically began about May 23rd, 1967, and an opinion as to the hearing loss in the left ear which historically began about October 15, 1968?"

A. "The only record which I have to go on in this regard is the history which he gave me of the hearing dropping off in his right ear initially and being associated with a cold, and about a year later the other ear doing the same thing. He also told me, of course, that he was operating a trip-hammer at the time of the initial loss of the right ear, but he did not tell me that about the second ear and of course I may not have asked him enough. I don't know."

\* \* \* \* \* \*

Q. "Dr. Combs, what period of time is usually required for a person to develop a hearing loss due to excessive loud noise in an occupation such as he described to you?"

A. "I have that one history of operating a trip-hammer. Actually, I don't know how loud a trip-hammer is. I guess it can vary in degree. In general, exposure to sound, excessive noise, let me say, requires exposure over a period of time, months, and sometimes years, to produce a profound impairment. However, sudden blasts, such as you can get from artillery fire when you're too close to it, can produce enough damage to initially cause it."

Q. "Did you relate the loss of hearing on the two separate occasions to his occupation as an occupational disease?"

A. "No, actually from the history I got I related it more to the possibility of it being viral."

Q. "What do you mean by viral?"

A. "Cold, flu, influenza type of thing. In children we see viral deafness as a result of measles or mumps, whooping cough—the viral diseases—and a simple cold will occasionally produce it."

Q. "Was there ever, Dr. Combs, on any of your examinations, any evidence of injury to either of the ears?"

A. "Not objectively, no."

And on cross-examination:

Q. "Now subjectively, Doctor, the excessive noise of a jackhammer could have aggravated his condition and brought about the deafness?"

A. "Yes, sir, it could."

Q. "What is his disability, Doctor? Could you tell the Board now with reference to his hearing, by that I mean is he permanently and totally disabled to work?"

A. "Yes, sir, I would say so."

Q. "And of course I realize it would be difficult to attribute what part was due to the occupational disease or to the trauma itself, would it not?"

A. "Yes, sir."

Q. "For the sake of repeating myself, in your opinion, Doctor, could the excessive noise of the jackhammer have brought about his present condition?"

A. "In the event that he used it over an extended period of time, yes."

\* \* \* \* \* \*

Q. "Dr. Combs, was there any relation between the hearing loss initial-

ly in the right ear and the hearing loss almost a year later in the left ear?"

A. "Essentially none."

Dr. Combs' written report, which is attached to his deposition, contains the following summary:

"It was my impression that we were definitely dealing with a severe, organic, sensori neural hearing impairment. According to his history this impairment came on following a cold in each instance and of course, he was working around excessive noise, also. There is no reason to question at all that exposure to excessive noise such as using a jackhammer can be very harmful to the hearing and will produce over a period of time a sensori neural hearing impairment. However, a sensori neural impairment usually does not come on suddenly from noise to the degree which he has here. A viral infection, I think, must be considered, not only from his history but because of the sudden onset of his acute hearing impairment of severe degree following a head cold."

After the Special Fund had been made a party defendant the Board appointed Dr. Laurie Thomas, another otolaryngologist of Lexington, to examine the claimant. Dr. Thomas paid no attention to the questions propounded to him by the letter of appointment and merely reported what he found with respect to the claimant's existing condition, which he described as "an extremely severe bilateral sensory neural loss which may not be complete but * * * does amount to complete disability in terms of the patient's hearing and understanding of words." There were no exceptions to Dr. Thomas' report, and he did not testify.

So there is the case. We cannot substantially distinguish it from Kelly Contracting Co. v. Robinson, Ky., 377 S.W.2d 892, 894 (1964), in which it was held that a possibility of causal connection is not enough to support a finding of such connection as a fact. Though it was observed in Hudson v. Owens, Ky., 439 S.W.2d 565, 569 (1969), that "medical evidence * * * . must be considered not as determinative but rather as a part of the totality of circumstances upon which the board must make the factual determination" with respect to causation, and was suggested in Inland Steel Company v. Johnson, Ky., 439 S.W.2d 562, 564 (1969), that cases ought not stand or fall on mere semantic choices of expression by different experts, we cannot hold that the evidence in this case justifies a conclusion that the claimant's work was a probable causal factor in his disability. Perhaps in answer to a properly-founded hypothetical question Dr. Ballard would have been willing to say that the neural damage probably was caused, aggravated or accelerated by the noise to which the claimant was exposed in his work, but he was never pressed, or even asked, to venture an opinion in terms of probability, nor was he interrogated as to what other causes may have been possible or probable. We do not mean to suggest that the opinion of a medical expert is always necessary to support a claim or that such opinions, when provided, are inevitably determinative one way or the other. For example, if a man is shot in the head and dies immediately thereafter it can reasonably be inferred, unless shown to the contrary, that the injury caused the death. Cf. Mason v. Commonwealth, Ky., 423 S.W.2d 532, 535 (1968). But to find the same relationship between the operation of a jackhammer and a sudden onset of deafness would require, as we see it, more definite connective evidence than was produced in this instance.

The judgment is reversed with directions that the award be set aside.

All concur.