RENDERED: OCTOBER 23, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0094-WC

ESTATE OF KYLE PERKINS BY               APPELLANTS
MEGAN PERKINS, ADMINISTRATOR;
MEGAN PERKINS, AS COURT
APPOINTED GUARDIAN
CONSERVATOR AND NEXT FRIEND
OF BODHI MARSHAL PERKINS, A
MINOR; MEGAN PERKINS, AS COURT
APPOINTED GUARDIAN
CONSERVATOR AND NEXT FRIEND
OF JUNIOR WINSTON PERKINS, A
MINOR; AND MEGAN PERKINS,
INDIVIDUALLY AS WIDOW OF KYLE
PERKINS


                   ON APPEAL FROM COURT OF APPEALS
V.                       NO. 2024-CA-0271
             WORKERS' COMPENSATION NO. WC-21-01615


NORTH AMERICAN STAINLESS;             APPELLEES
HONORABLE AMANDA MICHELLE
PERKINS, ADMINISTRATIVE LAW
JUDGE; AND WORKERS'
COMPENSATION BOARD OF
KENTUCKY


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Kyle Perkins, age 34, was employed by North American Stainless ("NAS")

in August of 2021. The world was still reeling from the effects of a pandemic

that had not yet ended. Parties agree that, sadly, Kyle Perkins contracted

COVID-19 ("Covid"), the illness progressed, a double lung transplant was performed, an infection developed, and Kyle Perkins succumbed to his illness.

An administrative law judge ("ALJ") found that a workers' compensation claim on behalf of Kyle Perkins ("Kyle")[1] was barred under Kentucky Revised Statute ("KRS") 342.0011(1) for compensation stemming from a communicable disease because the appellants, representatives of Kyle Perkins' estate ("Appellant"), failed to show Kyle's exposure and subsequent contraction of Covid at NAS was increased compared to the general public's exposure to Covid or that Kyle experienced an increased risk for exacerbation of Covid.

In affirming the ALJ, the Workers' Compensation Board ("Board") cited extensively to the depositions and hearing testimonies. Ultimately the Board, and the Court of Appeals, determined that there was substantial evidence supporting the ALJ's determination to deny benefits. In so holding, the Court of Appeals rejected the Appellant's interpretation of facts and application of law.

Appellant appealed the Court of Appeals determination affirming the Board's denial. Upon review, this Court concludes that the Court of Appeals was correct in holding that neither the ALJ nor the Board overlooked or misconstrued controlling statutes or caselaw or was clearly erroneous as a matter of law. For that, and reasons stated below, we affirm.

---

[1] Due to similarity in surnames with the ALJ and potential confusion further in this Opinion, we will refer to the deceased, Mr. Kyle Perkins, by his first name.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Kyle was employed as a mechanical maintenance shift technician on the NAS cold mill's C-crew.  His job was to provide maintenance services to the entire plant, primarily regarding issues involving mechanical problems.  The work required physical mobility within the plant, rotating shifts, and that he perform job requirements following company safety rules and in compliance with the Occupational Health and Safety Act and company regulations.  Within the C-crew, Kyle was partnered with Bradley Eric Springer ("Springer") and was in close proximity with Springer for much of their 12-hour shifts, utilizing a golf cart for transportation, eating lunch together, and working alongside each other.  Neither was vaccinated for Covid which meant NAS policy, per the HR-14-0018 Pandemic Plan, required them to wear masks when within six feet of each other and, specifically, when riding in a golf cart, vehicles, or a Kubota with another person.

In May 2021, NAS had canceled all company events, including the company picnic, unless at least 60% of the employees were vaccinated, provided on-site distribution of the Johnson & Johnson vaccine, and provided other locations for those desiring the Moderna or Pfizer brands.  Incentives were in place to encourage employee vaccination.  In June 2021, only 36% of employees were vaccinated and NAS required wearing facial covering.  The facility where Kyle worked was described as approximately "ten acres under roof" and was traversed via golf cart and foot.

3

According to Springer's deposition on July 30, 2021, both Kyle and Springer were reported by the security guard for not wearing the required face covering during their previous shifts. This failure to follow the facial covering policy and safety guideline was documented by a company email from the former safety director to the supervisor.

According to the testimony of his wife, Megan, she and Kyle went out to dinner on August 4, 2021, to celebrate their ninth anniversary, again went out August 13th for carry-out, and attended open-air soccer games where they sat by themselves, but otherwise they did not go out. Megan testified that on August 5th she went by herself to deliver a cushion to a friend at the Parkers' house, which is on a farm that also hosted outdoor racing.

Springer testified he attended a race event held at the Parkers' farm on the afternoon of August 7th. The remaining events occurring on August 7th were contested at the hearing. Springer also testified Kyle and Megan had attended a party at the Parkers' house that same night. Springer and Kyle discussed their weekend activities on August 8th at work.

A photo of Springer unmasked and within six feet of Kyle was taken while working together as part of their work procedures to document the state of a cable on August 8, 2021.

**SYMPTOMS**

Springer testified to working without any symptoms, physical problems, or sinus infection on Wednesday, August 11th and Thursday, August 12th. Kyle also worked his full shifts on August 11th and 12th but was already not

feeling well. Springer offered for Kyle to take it easy because "he wasn't 100 percent" on Wednesday and "was feeling worse" on Thursday. The temperature requirements for entry on-site had been removed; however, employees were aware of the ongoing pandemic, the requirement to stay home when sick, and the company mandate for masks.

Springer and an additional co-worker on the C-crew testified Kyle had symptoms of a runny nose and potential "sinus infection" during his Wednesday and Thursday evening shifts. Kyle told Springer that he "felt terrible" on his last shift that ended on the morning of the 13th. The next time Springer saw Kyle was in the hospital.

On the afternoon of August 13th, Kyle texted Springer that Megan had pneumonia. In response, Megan testified during her deposition that she had gone to a doctor after having sinus symptoms for approximately three weeks and was not tested for Covid, was given Azithromycin and a steroid, but had an allergic reaction causing her to go to the ER that evening. There, Megan testified a chest x-ray was conducted, no pneumonia was found, and it was determined to be an allergic reaction.

On August 13, 2021, Springer sent a text message to Kyle about his symptoms to which Kyle replied:

> Megan went to the Dr today an the told her she has pneumonia. They wanted to keep her but she said no you testing me for covid[2]

---

[2] All texts are reproduced verbatim.

On August 14, 2021, Springer was camping with friends on a local farm when he began to feel sinus pressure. Because of frequent sinus infections and a desire to catch them early, he went to the doctor for a steroid shot. While there, he was tested for Covid, and the test was positive. On August 15, 2021, Springer texted Kyle about his positive Covid test results. Kyle was already in the hospital getting an IV and was being tested for Covid.

At 6:46 p.m. on August 15, 2021, Springer texted Kyle about his positive results:

> **Springer:** I'm out with the covid
> **Kyle:** I'm in the hospital right now
> **Springer:** Oh shit. For what?
> **Kyle:** I fill like crap..going to give me an iv
> **Springer:** Damn. Have they tested you for covid?
> **Kyle:** Just did. You feeling ok
> **Springer:** I don't feel to bad. I thought I was getting a sinus infection so I figured I would go get a steroid shot and some prednisone and clear it up like I normally do. They tested me and it came back positive.
> **Kyle:** What you tell hardy
> **Springer:** Just that I tested positive.
> **Kyle:** What he say
> **Springer:** That it sucks
> **Kyle:** He probably be mad if mine comes back positive
> **Springer:** I guarantee it.

The text messages on August 13, 2021, and August 15, 2021, reference Megan's pneumonia, the fact that when Springer finally tested positive for Covid Kyle was already hospitalized, and Kyle's statement that "we" got it from the Parkers and that "we" are both still in the hospital. The language and interpretation of the messages were contested by the Appellant but conform to the ALJ's interpretation. As the ALJ "has the sole authority to determine the . .

6

. substance and inferences to be drawn from the evidence," we find no error in the interpretation here. *Paramount Foods, Inc. v. Burkhardt,* 695 S.W.2d 418, 419 (Ky. 1985).

Kyle had reported to King's Daughter's Health on August 15, 2021. Outside of his pre-existing morbid obesity, he presented with lightheadedness, nasal drainage, a worsening cough, and associated chills. He thought his symptoms were ragweed allergies. His stats indicated he required oxygen to maintain proper saturation, he was found to be Covid positive, and was admitted for treatment of hypoxia related to Covid. Reports indicated a diagnosis of pneumonia due to Covid. Both he and Megan tested positive at King's Daughter's Health on August 15th.

**TREATMENT**

Kyle was given IV steroids, breathing treatments, and oxygen, which he was later weaned off of prior to saturation stabilization and discharge. He was prescribed medication and advised on follow-up care. He was discharged August 16, 2021, early in the morning. After running a fever the next day, he returned to the hospital. Both Kyle and Megan were admitted. On August 19, 2021, Kyle texted his supervisor that he was in the ICU. Megan was discharged a few days later.

Kyle and Springer were work friends but only associated outside of work approximately one time. They routinely communicated about work and shifts. On August 16th, Kyle texted Springer at 7:56 a.m., after he and Megan were

diagnosed with Covid, "I bet we got it from Parkers." Kyle also texted that he and his wife were "both still in the hospital" and that "she was down there too."

Springer and Kyle did not work their scheduled day shift on August 16, 2021. Kyle texted Springer at 7:45 a.m. on August 16, 2021:

> **Kyle:** I bet we got it from parkers..meg said him and all kids of people are sick from down there
> **Springer:** Probably. Did yours come back positive?
> **Kyle:** Yes..we are both still in the hospital..wonder if we should tell hr that so they don't think we have it a work..cause she was down there too
> **Springer:** Damn. Might be a good idea.
> **Kyle:** Have you called them today
> **Springer:** Not yet
> **Kyle:** I just talked to them
> **Springer:** What did they say
> **Springer:** I got 2 tests done at 2 different doctors offices yesterday and the one that got sent off to the lab came back negative.
> **Kyle:** That's weird..I told them about the race's
> **Kyle:** Are you sick
> **Springer:** I texted a few of the guys that work the races and none of them are sick. It must just been isolated to parkers house and I wasn't around any off them. I don't feel to bad today.
> **Kyle:** Good..the nurse said that has been happening a lot..

When Kyle said, "I bet we got it from the Parker's," Springer testified Kyle was referring to himself and Megan. Megan testified Kyle was talking about Kyle and Springer. Kyle also mentioned the race Springer attended. When Springer replied that nobody else who attended the races was sick, that Covid must have been isolated to the Parkers' house, and that Springer had not been around any of them, Kyle replied "Good" but did not correct, alter, or amend Springer's story in any way. Springer was not hospitalized until later, on

8

approximately Sunday, August 22nd, for five days when his symptoms worsened, and his oxygen dropped below 80 percent.

Kyle's eldest daughter, Elizabeth Perkins, tested positive for Covid on August 22, 2021, while the other two children in the home tested negative on August 23, 2021. The boys would test positive later that month while Kyle's mother-in-law, who also lived in the household, never tested positive.

On August 26, 2021, Kyle was transferred to St. Elizabeth in Edgewood, Kentucky, where he was placed on extracorporeal membrane oxygenation (ECMO) and later transferred to UK's hospital. In addition to ECMO, Kyle was put on mechanical ventilator support.

Dr. Anstead, a pulmonologist at UK, treated Kyle from September 25, 2021, to November 22, 2021. He claimed the course of Kyle's illness was consistent with exposure on August 8, 2021, but conceded that he based his conclusion on the history received from the Perkins family. He acknowledged that symptoms can manifest anywhere from two to fourteen days after exposure.

Kyle underwent a double lung transplant but developed an infection and sadly passed away on November 22, 2021.

**CLAIM STATUS**

On Kyle's behalf, Megan electronically filed an Occupational Disease Claim on November 5, 2021. The claim identified Covid "resulting in the need for a bilateral lung transplant" as the occupational disease, and that the plaintiff "gave notice to his supervisor immediately on August 15, 2021, when

9

he tested positive." Having brought the Workers' Compensation claim to the Kentucky Labor Cabinet Department of Workers' Claims' attention, an ALJ was assigned for a benefit review. NAS sought dismissal for failure to provide documentation that this was a work-related occupational disease. The ALJ was to determine as a question of fact, after discovery, testimony, and a hearing, whether the disease was contracted at work or fell under the statutory definition of "occupational disease" as compensable under KRS 342.0011.

Depositions of Springer, Megan, Kyle's mother-in-law Tracy Yocum, Kyle's co-workers Aaron Whitt and Mike Hardy, Drs. Michael Anstead and Thomas Parker were taken. On July 27, 2022, the ALJ held an extensive hearing. During this hearing, Megan testified that she and Kyle did not attend the party at the Parkers' house.

At the request of NAS, Dr. Parker, a board-certified internal, pulmonary, and critical care medicine physician, reviewed Kyle's medical records. He described the contagious nature of Covid and said masked persons with Covid could still pass the disease to another if within six feet for thirty minutes or more. Having reviewed the opinion letter of Dr. Anstead and the depositions in this case, the ALJ found the timing of the onset of symptoms in both men to indicate it was unlikely Kyle contracted Covid from Springer.

The ALJ dismissed the claim alleging Kyle contracted Covid in the course of his employment because Appellant failed to prove Kyle sustained a work-related occupational disease per KRS 342.0011(3). The ALJ found the burden of proof had not been satisfied to uphold a claim that work at NAS placed Kyle

10

at a greater risk than the general public for contracting Covid or that his work placed him at an increased risk of exacerbation of Covid.

Neither party filed a petition for reconsideration.

The Board affirmed the ALJ's findings regarding the interpretation and application of KRS 342.0011(3) that Kyle did not contract an occupational disease while in the employ of NAS. Further, the Board found the ALJ did not err in finding Kyle did not sustain a work-related injury as defined in KRS 342.0011(1). Finally, the Board found the working conditions at NAS did not expose Kyle to a greater risk for Covid than the public at large. The Board's Opinion and Order made extensive reference to the depositions and entered large portions of the text communications between Springer and Kyle.

The Court of Appeals reviewed the statutory definition of "occupational disease" as "a subset of workplace injury under KRS 342.0011" holding a communicable disease such as COVID-19 "is excluded from the definition of 'injury' by KRS 342.0011(1) 'unless the risk of contracting the disease is increased by the nature of the employment.'" KRS 342.0011(1).

## II. STANDARD OF REVIEW

Workers' compensation is a creature of statute. *Campbell v. Universal Mines*, 963 S.W.2d 623, 624 (Ky. 1998). Statutory interpretation is a matter of law which requires de novo review by this Court. *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007). This Court is meant "to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question

11

of constitutional magnitude." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 688 (Ky. 1992). Questions of law and applications of the law to the facts will be reviewed de novo. *Bowerman v. Black Equip. Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009).

Regarding questions of fact, the ALJ as fact finder has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). In reaching his decision, the ALJ is free to choose to believe or disbelieve parts of the evidence from the total proof, no matter which party offered it. *Caudill v. Maloney's Disc. Stores*, 560 S.W.2d 15, 16 (Ky. 1977). The ALJ's discretion is not limitless, and we will reverse the ALJ if his opinion "is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law." *Ira A. Watson Dep't. Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000), or the ALJ "overlooked or misconstrued controlling law or so flagrantly erred in evaluating the evidence that it has caused gross injustice." *French v. Rev-A-Shelf*, 641 S.W.3d 172, 178 (Ky. 2022) (citing *U.S. Bank Home Mortg. v. Shrecker*, 455 S.W.3d 382, 384 (Ky. 2014)).

In other words, because the party failed to meet its burden of proof before the ALJ, this Court will consider whether the evidence is so overwhelming upon consideration of the record as a whole to compel a finding in claimant's favor. *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky. App. 1984). As long as there is substantial evidence in the record to support the Board's decision, this Court must defer to the Board, even if there is

12

conflicting evidence. *Kentucky Comm'n on Hum. Rts. v. Fraser*, 625 S.W.2d 852, 856 (Ky. 1981). "Substantial evidence" is evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people. *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971).

## III.    ANALYSIS

Appellant claims that the Court of Appeals only addressed Kyle's status as an employee of NAS and not his specific working conditions. Appellant argues that the actual working conditions, and not those of workers as a class, establish entitlement to benefits as an occupational disease. In resolving the issues raised in this appeal, we must interpret the language of KRS 342.0011 with regard to occupational diseases as applied to communicable diseases. When applying statutory interpretation,

> [w]e must assume that the General Assembly intends that a statute be read as a whole such that each of its constituent parts have meaning. And, in interpreting a statute, we must assume that the General Assembly did not intend for an interpretation that would lead to an absurd result. *Wilson v. Commonwealth*, 628 S.W.3d 132, 140 (Ky. 2021). Where legislative intent is apparent on the face of a statute and there is no question as to its meaning, "there is no room for construction, liberal or otherwise." *Fitzpatrick v. Crestfield Farm, Inc.*, 582 S.W.2d 44, 47 (Ky. App. 1978). The rule of liberal construction does not authorize judicial disregard of clear statutory language under the guise of interpretation and courts retain the duty to construe statutes "so as to do justice to both employer and employee." *Id.*

*Kindred Healthcare v. Harper*, 642 S.W.3d 672, 680 (Ky. 2022).

The statutory definition of an "occupational disease" compensable under Workers' Compensation Chapter 342 means "a disease arising out of and in the

13

course of the employment." KRS 342.0011(2). The statute continues and includes numerous requirements for an occupational disease to be determined as "arising out of the employment," stating it shall be deemed so

> *if* there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease, *and* which can be seen to have followed as a natural incident to the work as a result of the exposure occasioned **by the nature of the employment** *and* which can be fairly traced to the employment as the proximate cause. The occupational disease *shall* be incidental to the character of the business and not independent of the relationship of employer and employee. An occupational disease need not have been foreseen or expected but, after its contraction, it *must* appear to be related to a risk connected with the employment **and** to have flowed from that source as a rational consequence.

KRS 342.0011(3) (emphasis added).

While the Appellant takes issue with the characterization of Kyle's working conditions individually versus those as a class, the relevant concern involves the statutory interpretation of the "nature of the employment" requirement. *Id.* To be considered within the nature of the employment, the injury or exposure to the hazard "must have been an incident of or have issued from the performance of some duty that the employee owed the employer and resulted as a natural consequence of performance of that duty." *City of Prestonsburg v. Gray*, 341 S.W.2d 257, 260 (Ky. 1960). The disease must be related to a risk connected with the employment and not "based solely upon claimant's self-analysis of the conditions present there." *Champion v. Beale*, 833 S.W.2d 799, 803 (Ky. 1992). This Court has held:

> it must be evident that the [disease] exists at work to a greater degree than in other places generally to establish a link between the

14

> condition and some distinctive feature of claimant's job.  This proof is less burdensome in instances where the offending substance is obviously associated with the work.

*Id.* KRS 342.0011(1) excludes from the definition of "injury" any communicable disease unless the risk of contracting the disease is increased by the nature of the employment, thus, a communicable disease such as Covid is compensable as an injury when the claimant clearly establishes that the risk of contracting the disease is increased by the nature of the employment as defined by performance of the duties the employee owed the employer. *See City of Prestonsburg,* 341 S.W.2d at 260.

The ALJ, as fact finder, described the individualized work performed by Kyle to involve twelve-hour shifts with a single assigned partner, in this case Springer, working frequently within six feet of only each other, his role as a mechanical maintenance technician involved repair and maintenance of an indoor, acres-large facility accessible via golf cart and walking, and there was no indication this "injury" occurred as part of employment as an "essential" worker.  No evidence was presented that suggested the disease existed at work to a greater degree than in other places generally. *See Champion,* 833 S.W.2d at 803.

We agree with the Appellant's claim that it is "[c]entral to [Kyle's] appeal" and that compensability could be found if it were "*his work requirement* that he perform his duties at NAS during the COVID-19 pandemic within 6 feet of unvaccinated and unmasked co-workers throughout his 12-hour shift." (emphasis added).  It is clear, however, NAS did not require Kyle to work within

15

6 feet of unvaccinated and unmasked co-workers. In fact, NAS provided incentives to employees to obtain vaccination and required masking when within 6 feet of unvaccinated co-workers. The choice to be unmasked or to even remain around an unmasked co-worker, in violation of the work safety protocols and without reporting them to a supervisor, was a personal one. The "nature" of Kyle's employment required the opposite of the Appellant's argument: "employees must be masked when within six feet of unvaccinated co-workers." The "nature of employment" requirement for communicable diseases like COVID-19 using Kyle's actual working conditions versus "conditions of steelworkers in general" analysis would not alter the determination.

Additionally, the Appellant argues that the precedential holding of *Dealers Transport Co. v. Thompson,* 593 S.W.2d 84 (Ky. App. 1979), was incorrectly applied to the facts of the appeal. Appellant alleges the *Dealers* case tells us that the issue is "whether there is an increased risk to the worker, not whether the public had some risk, or even no risk at all." Citing Professor Larson's treatise on the application of the increased risk test, the Texas sunstroke case referenced in *Dealers* illustrates: "[t]he **very work** which the deceased was doing for his employer **exposed him to a greater hazard** from heatstroke than the general public was exposed to for the simple reason that the general public were not pushing wheelbarrow loads of sand in the hot sun on that day." *Dealers*, 593 S.W.2d at 89 (emphasis added) (quoting *American Gen. Ins. Co. v. Webster*, 118 S.W.2d 1082 (Tex. Civ. App. 1938)). An illness

16

was aggravated by the nature of the work performed as a consequence of required duties by the employer for the job.

This premise was relied upon by the *Dealers* Court to find that pneumonia was exacerbated by the exposure and varying hot and cold environments inherent to the performance of the job that aggravated the viral infection. The viral infection was not compensable, its origin unknown and immaterial under this approach, but "the work-related aggravation of it which resulted in death" was found compensable. *Dealers,* 593 S.W.2d at 90. Like heatstroke, pneumonia was an illness aggravated by the nature of the work performed as a consequence of required duties by the employer for the job. The very work which the deceased was required to do for his employer exposed him to a greater hazard of pneumonia than the general public was exposed to for the simple reason that the general public was not required to switch from extreme temperatures repeatedly for hours on end (or push wheelbarrow loads of sand in the hot sun).

Here, the increased risk approach fails. Covid is an ordinary disease as pneumonia or sunstroke may be characterized; however, aggravation by the nature of the work performed does not apply. Even if Kyle contracted Covid elsewhere (despite alleging this common, communicable disease was contracted at work), the *Dealers* "increased risk" test only applies as to the exacerbation and aggravation of the infection. There is no evidence in the record indicating the nature of the work performed by Kyle, as a consequence of required duties by NAS for his job, aggravated and exacerbated his Covid symptoms. Covid

17

was not an illness aggravated by the nature of the work performed as a consequence of required duties by the employer for the job. Because Kyle remained home once his symptoms materialized, no aggravation existed, therefore, application of the *Dealers* "increased risk" test is actually immaterial to the facts at hand.

However, the *Dealers* case references two additional ways to analyze the condition. Under the facts before us, these fail as well. As articulated in *Dealers*, the *Princess* test provided subjective and objective standards to determine whether a disease is an occupational disease. *Dealers,* 593 S.W.2d at 88 (Ky. App. 1979) (citing *Princess Mfg. Co. v. Jarrel,* 465 S.W.2d 45, 48 (Ky. 1971)). One could find an occupational disease if 1) there is substantial evidence that employment conditions specifically affected the employee in a manner resulting in contraction of disease, or 2) employment conditions generally can, to a reasonable medical probability, cause a particular disease or condition in a given class of workers. *Id.* In *Princess*, the work caused the hypersensitivity to the extent that a prolonged or unusual exposure caused a sensitization to a particular allergen and an allergic reaction developed. The specific employment conditions of prolonged exposure to a particular allergen specifically encountered as part of the employment affected the employee and of which there was "substantial evidence." The mere fact a claimant is present because of his employment duties will not, by itself, be sufficient to establish that the injury arose out of the employment but should demonstrate that his

18

risk of injury sustained is peculiar to his employment, or that his risk is increased as a consequence of the actual work requirements.

It is undisputed the second *Princess* test is inapplicable to the situation at hand as employment conditions at NAS, generally, do not to a reasonable medical probability cause Covid in maintenance technicians, steelworkers, or the given class of workers.

Similarly, the claim fails under the first *Princess* test as there was not substantial evidence that the specific employment conditions of Kyle, including driving around on a golf cart and working within six feet of another person, affected him in a manner resulting in contraction of the disease. The contraction of the disease was not specifically attributable to his working conditions. Contraction of the disease could be, and was found by the ALJ, attributable to nonwork-related activities of Kyle, including potential attendance at a party, and interactions of daily life as evidenced by the timeline of his symptoms and the text messages regarding other family members' illnesses, symptoms, and test results.

An injury arising from a communicable disease requires the claimant present clear evidence of work-related exposure followed by the development of an occupational disease. While Appellant was able to name the fellow employee who also contracted Covid and provide some evidence of potential exposure, there was also substantial evidence that Kyle likely was exposed to other potential sources of Covid prior to and during the incubation period.

19

As Covid can be classified as an ordinary disease similar to the flu, the common cold, or any other virus employees may be exposed to during life and while employed, the awarding of benefits in this instance would represent a significant change in the law and deviation from the statutory "nature of the employment" requirement, as well as the precedential cases regarding communicable disease. Additionally, the ALJ found no evidence that NAS workers as a class were more likely and more susceptible to contracting it than the public at large and no evidence the working environment is so unique as to cause the workers to be more susceptible to contracting Covid than the general public.

If the ALJ finds against the party having the burden of proof, the appellant must show that the ALJ misapplied the law or that the evidence in her favor was so overwhelming that it compelled a favorable finding. KRS 342.285; *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). While a claimant must show the evidence in his favor was so overwhelming that it compelled a different finding, this proposition must be considered in light of the complete opinion.

Here, the ALJ considered the possibility of a compensable injury but held the claimant failed to meet his burden of proof. The relationship between Kyle's work and his illness would require "more definite connective evidence than was produced in this instance." *Markwell & Hartz, Inc. v. Pigman*, 473 S.W.2d 842, 846 (Ky. 1971). "The mere possibility of the causal relationship is

20

insufficient to support an award." *Marcum v. General Elec. Co.*, 479 S.W.2d 640, 642 (Ky. 1972).

At the deposition of Kyle's co-workers, text messages indicating attendance at events surfaced, knowing and voluntary decisions to refrain from company-mandated mask-wearing, awareness of company policies involving vaccination incentives, and awareness of the increasingly common illness in the community at the time were discussed. "Instead of determining whether there was evidence that would have supported a different result, we must determine whether the decision the ALJ *did* make was supported by substantial evidence." *French*, 641 S.W.3d at 179. The ALJ could have found that there was exposure at work and she could have interpreted the evidence of the text messages in favor of the claimant; however, in light of the substantial evidence reviewed in support of the ALJ's finding regarding timing of symptoms, the specific nature of Kyle's employment, and the reasonableness of her interpretations of the evidence, the ALJ's findings are not unreasonable and the evidence does not compel the opposite result.

In the ALJ's Order, the ALJ made the inference "that most of the general public, regardless of their job, spends either 15 to 30 minutes within six feet of an unmasked individual or 30 minutes or greater within six feet of a masked individual throughout the day." Even if this inference was unsound, in light of the remaining substantial evidence of probative value to support the ALJ's finding, the Court of Appeals did not err when affirming the February 5, 2024, Opinion and Order of the Board upholding the dismissal of the claim for

21

benefits resulting from Kyle Perkins' illness and death, and the evidence is not so overwhelming as to compel a different result. *Holman Enter. Tobacco Warehouse v. Carter*, 536 S.W.2d 461, 465 (Ky. 1976); *Paramount*, 695 S.W.2d at 419.

This is not a case of an occupational disease involving exposure over time or related to a class of workers, such as coal miners. Susceptibility did not increase as a result of the work being done. The chances of contracting Covid from a single work partner, under the facts at hand, is not greater than the chances amongst the general public.

Ultimately, the cases referenced, both from the 1970's, do not articulate what has come to be a pressing and relevant question in light of the recent pandemic: When is a communicable disease compensable? The answer has three prongs and begins with the common worker's compensation threshold determination of 1) whether the "injury" is work-related. The burden of proof remains on the claimant to demonstrate it arose out of or in the course of employment.[3] Next, all communicable diseases must prove 2) the "nature of the employment" requirement demonstrating the risk of contracting the disease was increased by the required duties of the employee by the employer or the probability of contracting the disease is greater for the worker because of the nature of the job's employment conditions' than it is as a member of the

---

[3] "The party with the burden of proof on any issue has the burden of going forward and the ultimate burden of persuasion as to that issue. The ultimate burden of persuasion in all administrative hearings is met by a preponderance of evidence in the record, except when a higher standard of proof is required by law." KRS 13B.090.

general public. And finally, 3) the extent of the injury must be beyond the normally anticipated effects of a general communicable disease. These claims must also meet the durational requirement contained in KRS 342.040. This Court reinforces *Dealers'* desire to prevent "a flood of claims based on colds, grippe[,] and endless common ills allegedly arising out of employment."

Keeping in mind the beneficent spirit of the Act, and with construction consistent with that, the result we reach is extremely unfortunate for the Perkins family.

With this more clearly articulated test, the analysis is simple. The ALJ's finding and evidence on record demonstrated Appellant failed to meet the preponderance of the evidence burden of proof standard on the threshold issue of a work-related causation in this instance. Failing to demonstrate the illness arose out of or in the course of employment sufficient to meet the burden of proof, no further prongs of communicable disease compensability need to be addressed.

## IV. CONCLUSION

Amid the heartbreaking fallout of Covid and with deep condolences for all those affected, for the foregoing reasons, we affirm the Court of Appeals' decision upholding the Board's agreement with the ALJ's dismissal of the Estate of Kyle Perkins' claim for benefits for failing to prove a work-related injury.

All sitting. All concur.

23

COUNSEL FOR APPELLANTS:

Ruth Helen Baxter
Jake Alexander Thompson
Crawford & Baxter PSC


COUNSEL FOR APPELLEE, NORTH AMERICAN STAINLESS:

Sean Michael Whitt
Brent Monroe House
VanAntwerp Attorneys LLP

ADMINISTRATIVE LAW JUDGE:

Hon. Amanda Michelle Perkins

WORKERS COMPENSATION BOARD OF KENTUCKY:

Michael Wayne Alvey, Chairman